**In re DEL MONTE FOODS COMPANY SHAREHOLDERS LITIGATION.**

**C.A. No. 6027–VCL.**

Court of Chancery of Delaware.

Submitted: Feb. 11, 2011.
Decided: Feb. 14, 2011.

---

65. Compl. ¶¶ 13, 24–26.

Stuart M. Grant, Michael J. Barry, Diane Zilka, Christine M. Mackintosh, Grant & Eisenhofer P.A., Wilmington, Delaware; Hung G. Ta, Brenda F. Szydlo, Michele S. Carino, Grant & Eisenhofer P.A., New York, New York; Randall J. Baron, A. Rick Atwood, Jr., David T. Wissbroecker, Edward M. Gergosian, David A. Knotts, Robbins Geller Rudman & Dowd LLP, San Diego, California; Plaintiffs' Co–Lead Counsel.

Raymond J. DiCamillo, Rudolf Koch, Susan M. Hannigan, Richards, Layton & Finger P.A., Wilmington, Delaware; Mark A. Kirsch, Diana M. Feinstein, Gibson, Dunn & Crutcher LLP, New York, New York; Paul J. Collins, Joseph W. Guzzetta, Gibson, Dunn & Crutcher LLP, Palo Alto, California; Attorneys for Defendants Samuel H. Armacost, Timothy G. Bruer, Mary R. Henderson, Victor L. Lund, Terence D. Martin, Sharon L. McCollam, Joe L. Morgan, David R. Williams, and Richard G. Wolford.

Kenneth J. Nachbar, John P. DiTomo, S. Michael Sirkin, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Peter E. Kazanoff, Paul C. Gluckow, Simpson Thacher & Bartlett LLP, New York, New York; Attorney for Defendants Blue Acquisition Group, Inc., Blue Merger Sub Inc., Centerview Partners, Kohlberg Kra-

vis Roberts & Company LP, and Vestar Capital Partners.

## OPINION

LASTER, Vice Chancellor.

On November 24, 2010, Del Monte Foods Company ("Del Monte" or the "Company") entered into an agreement and plan of merger with Blue Acquisition Group, Inc. and its wholly owned acquisition subsidiary, Blue Merger Sub Inc. (the "Merger Agreement" or "MA"). Blue Acquisition Group is owned by three private equity firms: Kohlberg, Kravis, Roberts & Co. ("KKR"), Centerview Partners ("Centerview"), and Vestar Capital Partners ("Vestar"). Because KKR is the lead firm, I generally refer to the sponsor group as "KKR." The Merger Agreement contemplates a $5.3 billion leveraged buyout of Del Monte (the "Merger"). If approved by stockholders, each share of Del Monte common stock will be converted into the right to receive $19 in cash. The consideration represents a premium of approximately 40% over the average closing price of Del Monte's common stock for the three-month period ended on November 8, 2010. The $19 price is higher than Del Monte's common stock has ever traded.

The stockholders of Del Monte are scheduled to vote on the Merger on February 15, 2011. The plaintiffs seek a preliminary injunction postponing the vote. They originally asserted that the individual defendants, who comprise the Del Monte board of directors (the "Board"), breached their fiduciary duties in two separate ways: first by failing to act reasonably to pursue the best transaction reasonably available, and second by disseminating false and misleading information and omitting material facts in connection with the stockholder vote. The defendants mooted the disclosure claims through an extensive proxy supplement released during the afternoon of February 4, 2011 (the "Proxy Supplement").

This case is difficult because the Board predominantly made decisions that ordinarily would be regarded as falling within the range of reasonableness for purposes of enhanced scrutiny. Until discovery disturbed the patina of normalcy surrounding the transaction, there were only two Board decisions that invited serious challenge: first, allowing KKR to team up with Vestar, the high bidder in a previous solicitation of interest, and second, authorizing Barclays Capital, the financial advisor to Del Monte, to provide buy-side financing to KKR.

Discovery revealed a deeper problem. Barclays secretly and selfishly manipulated the sale process to engineer a transaction that would permit Barclays to obtain lucrative buy-side financing fees. On multiple occasions, Barclays protected its own interests by withholding information from the Board that could have led Del Monte to retain a different bank, pursue a different alternative, or deny Barclays a buy-side role. Barclays did not disclose the behind-the-scenes efforts of its Del Monte coverage officer to put Del Monte into play. Barclays did not disclose its explicit goal, harbored from the outset, of providing buy-side financing to the acquirer. Barclays did not disclose that in September 2010, without Del Monte's authorization or approval, Barclays steered Vestar into a club bid with KKR, the potential bidder with whom Barclays had the strongest relationship, in violation of confidentiality agreements that prohibited Vestar and KKR from discussing a joint bid without written permission from Del Monte.

Late in the process, at a time when Barclays was ostensibly negotiating the deal price with KKR, Barclays asked KKR

for a third of the buy-side financing. Once KKR agreed, Barclays sought and obtained Del Monte's permission. Having Barclays as a co-lead bank was not necessary to secure sufficient financing for the Merger, nor did it generate a higher price for the Company. It simply gave Barclays the additional fees it wanted from the outset. In fact, Barclays can expect to earn slightly more from providing buy-side financing to KKR than it will from serving as Del Monte's sell-side advisor. Barclays' gain cost Del Monte an additional $3 million because Barclays told Del Monte that it now had to obtain a last-minute fairness opinion from a second bank.

On the preliminary record presented in connection with the injunction application, the plaintiffs have established a reasonable probability of success on the merits of a claim for breach of fiduciary duty against the individual defendants, aided and abetted by KKR. By failing to provide the serious oversight that would have checked Barclays' misconduct, the directors breached their fiduciary duties in a manner reminiscent of *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del.1989). In that decision, the Delaware Supreme Court enjoined a transaction—ironically a leveraged buyout sponsored by KKR—when self-interested management and their financial advisor concealed information from the board. Like management's deal-specific, buy-side conflict in *Mills*, Barclays' deal-specific, buy-side conflict tainted the advice it gave and the actions it took.

To hold that the Del Monte directors breached their fiduciary duties for purposes of granting injunctive relief does not suggest, much less pre-ordain, that the directors face a meaningful threat of monetary liability. On this preliminary record, it appears that the Board sought in good faith to fulfill its fiduciary duties, but failed because it was misled by Barclays. Unless further discovery reveals different facts, the one-two punch of exculpation under Section 102(b)(7) and full protection under Section 141(e) makes the chances of a judgment for money damages vanishingly small. The same cannot be said for the self-interested aiders and abetters. But while the directors may face little threat of liability, they cannot escape the ramifications of Barclays' misconduct. For purposes of equitable relief, the Board is responsible.

To remedy (at least partially) the taint from Barclays' activities, the plaintiffs ask that the vote on the Merger be enjoined for a meaningful period (30 to 45 days) and that the parties to the Merger Agreement be enjoined from enforcing the deal protections during that time. They have not sought (nor would I grant) a decree enjoining the Merger pending a post-trial adjudication. The plaintiffs argue that this limited injunctive relief will restore (albeit incompletely) the stockholders' unique opportunity to receive a topping bid free of fiduciary misconduct. Such an injunction would deprive KKR temporarily of the advantages it obtained by securing a deal through collusion with Barclays, while at the same time preserving the stockholders' ability to determine for themselves whether to accept the $19 per share Merger price. The plaintiffs analogize this limited relief to an injunction conditioned on the making of corrective disclosures, which similarly imposes a temporary transactional delay and then allows stockholders to decide for themselves whether to accept a deal.

For the reasons that follow, I grant the relief plaintiffs seek, although for a shorter time period that takes into account the transaction's exposure to the market. The defendants are enjoined preliminarily from proceeding with the vote on the Merger

for a period of 20 days. Pending the vote on the Merger, the parties to the Merger Agreement are enjoined from enforcing the no-solicitation and match-right provisions in Section 6.5(b), (c) and (h), and the termination fee provisions relating to topping bids and changes of recommendation in Section 8.5(b). The injunction is conditioned on the plaintiffs posting a bond in the amount of $1.2 million.

## I. FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with the plaintiffs' application for a preliminary injunction. The parties have submitted numerous documentary exhibits and the deposition testimony of seven fact witnesses. With their answering briefs, the defendants lobbed in four affidavits from witnesses who were deposed. Each of these lawyer-drafted submissions sought to replace the witnesses' sworn deposition testimony with a revised and frequently contradictory version. Had the differing averments been elicited by defense counsel during deposition, as they readily could have been, then plaintiffs' counsel could have tested the witnesses' assertions through cross-examination. Except on routine or undisputed matters, I have discounted these "non-adversarial proffers"[1] and relied on the deposition testimony and contemporaneous documents. What follows are the facts as they are likely to be found after trial, based on the current record.

### A. Moses Works Behind The Scenes To Put Del Monte In Play.

Investment banks generate large fees from doing deals. To facilitate transactional activity, investment bankers routinely pitch deals to parties they hope might be interested. Coverage officers for investment banks regularly visit past, present, and potential clients to suggest mergers, acquisitions, and other strategic alternatives. Barclays is no exception.

Barclays has a strong presence in the consumer food and pet product sectors where Del Monte operates. Peter J. Moses is the Barclays managing director with coverage responsibility for Del Monte. Barclays and Del Monte have enjoyed a close relationship. In 2009, Barclays acted as joint book-runner on Del Monte's $450 million issuance of 7.5% senior subordinated notes and as joint dealer-manager and solicitation agent on Del Monte's tender offer and consent solicitation for its $8^{5/8}\%$ senior subordinated notes. During late 2009, Barclays advised Del Monte on and arranged financing for its unsuccessful acquisition of Waggin' Train LLC. In January 2010, Barclays acted as co-lead arranger for Del Monte's $1.2 billion senior secured credit facility. Barclays understood that it was one of Del Monte's principal investment banks.

Del Monte's stable businesses throw off large amounts of cash, a critical attribute for debt-fueled LBOs. In fiscal 2010, for

---

1. *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del.Ch. May 22, 2000) (describing witness affidavits and explaining that the Court of Chancery will "ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers"); *see Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del.Ch.2000) ("To the extent the affidavits contradict the depositions, this Court will exclude the offending affidavit testimony."); *see also Chesapeake Corp. v. Shore*, 771 A.2d 293, 302 & n. 7 (Del.Ch.2000) (expressing disappointment with the proffering of less-knowledgeable board members rather than the chairman or top managers and stating " '[t]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse.' " (quoting *Kahn v. Lynch Comm. Sys., Inc.*, 638 A.2d 1110, 1119 n. 7 (Del.1994))).

example, Del Monte generated $3.7 billion in net sales and $250 million in cash flow. According to the bankers deposed in this case, the debt markets in late 2009 were again receptive to leveraged acquisitions, having shaken off the cobwebs from the concussive impact of Lehman Brothers' bankruptcy. Mergers and acquisitions activity in the canned food and pet products sectors had picked up. Investment bankers were busy pitching Del Monte on potential acquisitions and pitching potential acquirers on Del Monte.

Like many large banks, Barclays has strong relationships with various LBO shops. KKR is one of Barclays' more important clients. Tarone Tr. 95. Over the past two years, KKR has paid Barclays over $66 million in fees. Barclays has worked with KKR on half a dozen projects in the consumer and retail space, including a large transaction where Barclays acted as both sell-side advisor and provided buy-side financing for KKR. Tarone Tr. 93–94.

On December 17, 2009, Moses and other Barclays bankers met with KKR to present various opportunities, including an acquisition of Del Monte. In early January 2010, Moses met with KKR again. KKR said it was ready "to take the next step" with Del Monte and planned to partner with Centerview on a bid. PX 16. Moses responded by outlining with prophetic clarity the process Del Monte would follow: a narrow, private solicitation of interest from a small group of approximately five sponsors with no strategic bidders. Moses made similar pitches during the same time period to other private equity firms, including Apollo Management.

## B. Apollo's Expression Of Interest And Del Monte's Process

Before KKR could "take the next step," Apollo sent Del Monte a written expression of interest in an acquisition at $14 to $15 per share. After receiving the letter, Del Monte reached out to Barclays. Moses believed Del Monte was also reaching out to other banks, including Goldman Sachs, a firm that ran an earlier process for the Company.

Moses told Del Monte that Barclays was well-positioned to advise Del Monte because Barclays "knew many of the entities that might be an interested buyer." Ben. Tr. 59. Moses did not mention that he personally had been pitching Apollo, KKR, and other private equity firms on acquiring Del Monte. The Board did not learn of Moses' efforts to stir up the initial LBO bid until discovery in this litigation.

Moses also did not mention that Barclays planned from the outset to seek a role in providing buy-side financing. Barclays' internal "Project Hunt [Del Monte] Screening Committee Memo" dated January 25, 2010, stated bluntly that "Barclays will look to participate in the acquisition financing once the Company has reached a definitive agreement with a buyer." PX 54. A March 2010 version of the memo reiterated Barclays' intent. The Board did not learn that Barclays intended from the outset to have a buy-side role until discovery in this litigation.

Barclays immediately began advising Del Monte on responding to Apollo's expression of interest and exploring strategic alternatives. Moses recommended that the Board pursue a targeted, non-public process that tracked precisely what Moses had previewed with KKR and the other private equity firms. There are sound and reasonable justifications for such an approach, including a desire to avoid market leaks that could disrupt company operations and spook employees. But a narrow, targeted process involving a few large private equity firms also furthered Barclays' goal of providing buy-side financing. Private equity buyers are generally more

likely than strategic buyers to require financing, and Barclays was one of a limited group of institutions with sufficient resources to handle a transaction as large as the Del Monte LBO.

Barclays then identified the five LBO shops that would be invited to submit expressions of interest: KKR, Apollo, The Carlyle Group, CVC Partners, and the Blackstone Group. The Board adopted Barclays' recommendation.

Despite efforts to keep the process quiet and private, word leaked out. Vestar and Campbell's Soup contacted Barclays and asked to be included, which they were. Blackstone dropped out, and Del Monte entered into confidentiality agreements with the six participants. Each of the participants agreed not to discuss the confidential information they obtained from Del Monte or their bids with anyone, including each other. A critical provision stated:

> In addition, you agree that, without the prior written consent of the Company, you and your Representatives will not disclose to any other person (other than your Representatives) the fact that you are considering a possible transaction with the Company, that this Agreement exists, that the Confidential Information has been made available to you, that discussions or negotiations are taking place concerning a possible transaction involving the Company or any of the terms, conditions, or other facts with respect thereto (including the status thereof).... Without limiting the generality of the foregoing, you further agree that you will not, directly or indirectly, share the Confidential Information with or enter into any agreement, arrangement or understanding, or any discussions which would reasonably be expected to lead to such an agreement, arrangement or understanding with any

other person, including other potential bidders and equity or debt financing sources (other than your Representatives as permitted above) regarding a possible transaction involving the Company without the prior written consent of the Company and only upon such person executing a confidentiality agreement in favor of the Company with terms and conditions consistent with this Agreement.

PX 18 at 2 (the "No Teaming Provision"). By securing this language, the Board ensured that Del Monte would have the contractual right to control the competitive dynamics of the process and determine whether any bidders would be allowed to work together on a joint bid. The confidentiality agreement also contained a two-year standstill. *Id.* at 4.

The confidentiality agreements provided a collateral benefit to Barclays. Absent Company consent, the signatories could not discuss potential financing with any source other than Barclays. *Id.* at 2. As with the decision to engage in a targeted, non-public canvass of private equity buyers, there are sound and reasonable justifications for such a provision. At the same time, the limitation served Barclays' interests in obtaining a piece of the buy-side financing. Because of the provision, Barclays would have the first crack at discussing financing with each bidder, its credit group would be familiar with the deal, and its bankers could more persuasively pitch for a piece of the action. See Tarone Tr. 129–31. The lead banker on Barclays' financing team acknowledged that Barclays would express interest in providing financing when discussing capital structures with bidders and that this put Barclays in the catbird seat for the business. *See Id.* at 89–93.

After executing a confidentiality agreement, each potential bidder was provided

with access to non-public information and received presentations from Del Monte senior management. All potential bidders were directed to submit non-binding indications of interest by March 11, 2010. Five did; Campbell's Soup did not. Carlyle proposed a transaction in a range of $15.50 to $17.00 per share and asked for permission to explore debt financing with Bank of America, JPMorgan, Deutsche Bank, and Credit Suisse. Apollo proposed a transaction in a range of $15.50 to $17.00 per share and asked for permission to explore financing with Bank of America, JPMorgan, Morgan Stanley, Deutsche Bank, Credit Suisse, UBS, and BMO Capital Markets. CVC proposed a transaction at $15.00 to $16.50 per share, expressed interest in taking on an equity partner, and proposed to raise financing through its internal debt financing team. KKR expressed interest in a transaction at $17 per share. KKR did not ask for permission to talk to any banks and stated only that their bid contemplated "newly raised debt in line with the guidance provided by Barclays." PX 20 at 3. To a Barclays' banker seeking a buy-side role, KKR's letter would have been the most reassuring, particularly because KKR had worked with Barclays in a dual role before.

Vestar's bid raised tactical issues. Vestar expressed interest in a transaction in a range of $17.00 to $17.50 per share, making it the high bidder. Everyone understood that Vestar would need to pair up with at least one other sponsor. Vestar had made clear from the outset, and confirmed in its expression of interest, that "[it] would expect to commit to half of the required equity in this transaction and would look to partner with another private equity firm to fill out the remaining portion." PX 50 at 2. Vestar thus was not going to bid alone. Its advantage was expertise in the food business and its strength as an operator. James Ben, who led the Barclays M & A team, regarded Vestar as a valuable participant in the sale process and expected that the firm would be a value-promoting partner for another bidder, though more for its operational expertise than as a source of capital. Ben Tr. 93–94. Moses suggested that Vestar consider pairing up with Carlyle. Ben considered pairing Vestar with Apollo. CVC had expressed interest in a second sponsor and was another logical option. Internal KKR documents reflect concern about Vestar working with another firm.

During its regularly scheduled meeting on March 18, 2010, the Board considered the five indications of interest. The Board decided that the Company's stand-alone growth prospects were sufficiently strong that it was not in the stockholders' best interests to proceed further with the process. The directors also concluded that Barclays had pushed too far, too fast, and that Barclays had not been hired to actually sell the company. *See* Martin Tr. 23–24. Moses blamed Richard Wolford, Del Monte's Chairman, President, and CEO. He believed Wolford turned against the LBO at the last minute, spoke privately with the directors, and allowed Moses to walk into a hostile meeting unaware. KKR thought that "Barclays didn't do such a good job here w/ Wolford and the board." PX 23. When Barclays later kicked off the LBO process again, Moses would do a better job setting the table.

## C. KKR Continues To Pursue Del Monte.

The Board specifically instructed Barclays "to shut [the] process down and let buyers know the company is not for sale." PX 57. Over the ensuing months, KKR reached out to Del Monte on at least two occasions. In April 2010, KKR representatives met with Wolford and David Meyers, Del Monte's CFO. KKR said it wanted

to keep the lines of communication open about future opportunities. In May 2010, KKR approached Del Monte about jointly pursuing acquisitions. Del Monte declined, both because KKR's capital was too expensive and because Del Monte had all the capital it needed. KKR also continued to meet with Barclays.

## D. Barclays Pairs Up Vestar With KKR.

In September 2010, Moses sensed that the timing was right to put the Del Monte LBO back together. Moses had lunch with Brian Ratzan of Vestar. Moses suggested that it might be "an interesting time to make another approach to [Del Monte]" and that, if Vestar were interested, "the ideal partner would be KKR." Ratzan Tr. 35. Moses said that it was an "opportune time" for approaching Del Monte because "[t]he company had missed its numbers for a couple of quarters [and] [t]he stock price was down." *Id.* at 36. On September 14, Moses discussed the idea with KKR. After meeting with KKR, Moses called Ratzan. Moses then emailed his colleagues that Vestar "is going to partner with KKR on [Del Monte]. So team wi[ll] be kkr, vestar and hooper (centerview). Obviously this is confidential." PX 60.

At the time, both Vestar and KKR were bound by their confidentiality agreements with Del Monte. The No Teaming Provision prohibited Vestar and KKR from entering into any "agreement, arrangement or understanding, or any discussions which would reasonably be expected to lead to such an agreement, arrangement or understanding with any other person, including other potential bidders and equity or debt financing sources (other than your Representatives as permitted above) regarding a possible transaction involving the Company without the prior written consent of the

Company...." Vestar and KKR did not have "prior written consent" from Del Monte. Nor did Barclays. In fact, Barclays was not authorized at that time to do anything on behalf of Del Monte. The Board had instructed Barclays "to shut [the] process down and let buyers know the company is not for sale." PX 57.

By pairing Vestar with KKR, Barclays put together the two highest bidders from March 2010, thereby reducing the prospect of real competition in any renewed process. There were other logical pairings that would have promoted competition. Teaming up Vestar and KKR served Barclays' interest in furthering a deal with an important client (KKR) that previously had used Barclays for buy-side financing. After Moses paired Vestar with KKR, Vestar never considered working with a different sponsor.

## E. KKR Makes Its Bid.

On October 11, 2010, representatives of KKR asked to meet with Wolford. During the meeting, KKR delivered a written indication of interest from KKR and Centerview to acquire Del Monte for $17.50 in cash. The price represented a 28.7% premium over the closing price of Del Monte's common stock on the previous trading day. While nominally higher than the $17 offered in March, it was a step back given intervening market developments. Del Monte and Barclays calculated that an equivalent bid would have been $18.32. *See* PX 72 ("I landed on $18.32/share as the equivalent offer relative to the $17 previously").

The KKR letter did not mention Vestar, and Vestar representatives did not attend the meeting. In preparing for the meeting, KKR and Vestar agreed not to disclose Vestar's participation because "it's just another thing Rick will have to go back to his board and explain. Will be

easier to bring in Vestar once we have traction with the Company." PX 24.

After the October 11, 2010, meeting, Barclays worked with KKR to conceal Vestar's participation. For example, on October 31, Brown of KKR emailed his colleagues that Vestar would not attend a meeting with Del Monte because of the complications it would create. PX 26 ("delicate time for Board, don't want to upset matters potentially w[ith] a group change at a critical juncture. Vestar ultimately ok w[ith] this"). Moses agreed that it was best to keep Vestar's involvement hidden. *See* PX 62 (e-mail from Moses to Brown, dated Oct. 31, 2010, "agree at this point that we keep meeting to K[KR] and Centerview from your side.").

### F. The Board Adopts A Single–Bidder Strategy.

On October 13, 2010, the Board met to consider KKR's indication of interest. The Board met again on October 25. Management discussed the Company's long range plan and the challenges and risks associated with its execution. Management suggested that a transaction with KKR potentially represented a "risk-free alternative" to the long range plan. On the question of whether to sell, management faced conflicts of its own. Wolford planned to retire in 2012 and was being pressed by the Board for a succession plan. Wolford was resisting and had said he would rather sell the Company than remake his team. From an economic standpoint, Wolford would receive an additional $24 million if Del Monte was sold before his retirement. Del Monte CFO Meyers also planned to retire in 2012 and would receive an additional $5 million if the Company was sold before then. *See* Proxy Supp. at 6–11.

After deciding to pursue discussions with KKR, the Board considered whether to conduct a pre-signing market check. The Board concluded that none was needed. First, KKR's indication of interest at $17.50 per share was at the high end of the indications of interest that the Company had received in March 2010, although lower on a relative basis after adjusting for intervening market trends. Second, the Board felt that no other potential bidders were lurking in the wings, because only Campbell's Soup came forward when word of the private process leaked in early 2010. Third, no one other than KKR had communicated with Del Monte in the eight months since the Board instructed Barclays to tell bidders that Del Monte was not for sale. Fourth, the Board was concerned that a renewed process could have detrimental effects on employees, customers, and the stock price, particularly if the process did not result in a completed transaction. Finally, the Board considered that the previous high bid of $17.50 had been submitted by Vestar, a firm that needed to partner with a larger sponsor to make a bid. At the time, the Board did not know that Barclays had teamed Vestar with KKR.

The Board ultimately decided to adopt a single-bidder strategy of negotiating only with KKR. During the meeting, the Board formally authorized the Company to "re-engage" Barclays as its financial advisor. After the meeting, the Chairman of the Strategic Committee, Terence Martin, met with Moses and Ben to negotiate Barclays' new engagement letter. Martin "personally directed that Barclays was not to speak or act on Del Monte's behalf until the terms of the engagement letter had been finalized." Martin Aff. ¶ 22. The Barclays representatives did not tell Martin that Moses had been communicating with Vestar and KKR, put the two firms together, and helped spur the KKR bid. Bar-

clays then began advising Del Monte on the bid Moses engineered.

## G. The Initial Negotiations With KKR.

Between October 26 and November 9, 2010, Barclays interacted with KKR. Barclays reported frequently to Del Monte management and the Strategic Committee, but Barclays was the principal point of contact for KKR.

On October 27, 2010, the Board asked Barclays to tell KKR that the $17.50 per share offer was insufficient, but that the Company was prepared to give KKR access to due diligence information to allow them to submit a higher offer. On November 4, KKR attended a meeting with Del Monte management. Barclays and KKR agreed that Vestar would not attend and to keep Vestar's involvement secret from the Company

On November 8, 2010, news of a potential Del Monte LBO leaked when the *London Evening Standard* reported that KKR had offered to acquire the Company for $18.50 per share. Later in the day, KKR contacted the Board and raised its offer to $18.50 with a request for exclusivity. Vestar's participation still went unmentioned.

On November 9, 2010, the Board met to discuss KKR's proposal. The Board declined to grant formal exclusivity, but did not reach out to any other bidders. The Board also declined to approve a transaction at $18.50 per share. At the same time, the Board signaled its receptivity by authorizing KKR to begin discussing financing commitments with lenders. According to an internal KKR email, "Barclays guidance was we should read real significance into their authorizing full access with instructions to get us to a point of being firm/done based on the price we raised to." PX 29.

## H. Del Monte Finally Learns About Vestar's Involvement And Barclays' Buy–Side Desires.

With momentum building towards a deal, the time had come for the repeat M & A players to hit up the Board with two unsavory requests. First, during the week of November 8, 2010, KKR "formally approached Barclays Capital to request that the Company allow KKR/Centerview to include Vestar in the deal as an additional member of the sponsor group." Proxy Supp. at 3. Note the artful phrasing. Barclays had paired Vestar with KKR in September, and they had been *de facto* partners since at least October. Yet Barclays had never been "formally approached," and technically Vestar had never been "included in the deal as an additional member of the sponsor group."

No one suggested that adding Vestar was necessary for KKR to proceed with its bid. There is no evidence that including Vestar firmed up a wavering deal. The Board was not told that Vestar in fact had been partnered with KKR since September, when Barclays put them together. The contemporaneous record does not reflect any consideration given to the ramifications of permitting KKR to team up with the firm who previously submitted the high bid and who could readily have teamed with Carlyle, Apollo, CVC, or another large buyout shop. The Board did not consider rejecting KKR's request, enforcing the confidentiality agreement, and inviting Vestar to participate with a different sponsor to generate competition. The Board did not seek to trade permission for Vestar to pair with KKR for a price increase or other concession.

The second unsavory request was when Barclays finally asked Del Monte if it could provide buy-side financing, as Barclays had been planning to do since at least January 2010. Barclays had long

been signaling KKR about its desire to participate. On November 8, Moses asked KKR to give Barclays one third of the debt. KKR agreed. The next day Brown reported by email to the KKR investment committee that Barclays had "asked us to use JPM, BofA and Barclays themselves as the financing banks; we find that acceptable and will ask to add one more." PX 29. Also on November 9, Barclays asked Del Monte management for permission to provide buy-side financing to KKR. They agreed. *See* PX 40. On November 12, Brown reported to his KKR colleagues that "Barclays has been cleared to be a financing bank." JX 30.

At the time Barclays asked for and obtained Del Monte's permission to provide buy-side financing, *Del Monte and KKR had not yet agreed on price.* Barclays' buy-side participation was not used to extract a higher price. Nor was it necessary to finance the deal. No one thought that KKR needed Barclays, and other banks were already clamoring for their shares. Barclays simply wanted to double-dip. Through its buy-side role, Barclays will earn $21 to $24 million, as much and possibly more than the $23.5 million it will earn as the sell-side advisor.

On November 23, 2010, Del Monte executed a letter agreement that formally authorized Barclays to provide financing to KKR. In contrast to the Barclays witnesses, who reluctantly admitted when pressed that providing buy-side financing *might* create the *appearance* of a *potential* conflict, the November 23 letter acknowledged that Barclays' relationship became adverse to Del Monte and that if push came to shove, Barclays would look out for itself. In the language of the letter, "[i]n the event that Barclays Capital is asked to provide acquisition financing to a buyer of the Company, the Company should expect Barclays Capital to seek to protect its

interests as a lender, which may be contrary to the interests of the Company." PX 35 at 1. Because of the conflict of interest, Barclays insisted in the letter agreement that Del Monte obtain a second fairness opinion. *Id.* ("Barclays Capital believes that it is essential, in addressing such conflicts of interest, for the Company to receive independent financial advice, including an additional fairness opinion, from an independent third party firm who is not involved in the acquisition financing . . . ."). Not only did Del Monte fail to secure any benefits for itself or its stockholders as the price of Barclays' buy-side participation, but Del Monte actually incurred an additional $3 million for a second financial advisor. Del Monte hired Perella Weinberg Partners LP to fulfill this role. Perella Weinberg's fee is not contingent on closing. On the plus side, this helps make its work independent. On the minus side, Del Monte incurred a $3 million expense to help Barclays make another $24 million, and Del Monte will have to bear this expense even if the deal does not close.

## I. Barclays Continues To Negotiate With KKR.

Between November 19 and 22, 2010, at the same time it was working with KKR to provide financing for the deal, Barclays ostensibly negotiated with KKR over the price. On November 22, Barclays reported that KKR was willing to consider paying $18.75 per share. Internally, Barclays already had evaluated a $19 price for KKR, and KKR had secured authority from its Investment Committee to bid up to $19 per share. The Board declined the $18.75 figure and instructed Barclays to go back to KKR.

On November 24, 2010, Barclays reported that KKR had made its best and final offer of $19 per share. Later in the day, the Board met to consider the offer. Bar-

clays and Perella Weinberg delivered their fairness opinions. The Board reviewed the provisions of the proposed Merger Agreement that had been negotiated between outside counsel to the Company and KKR. After discussion and an executive session, the Board unanimously approved the Merger Agreement.

## J. The Terms Of The Merger Agreement

Section 6.5(a) of Merger Agreement provided for a 45–day post-signing go-shop period during which Del Monte had the right to "initiate, solicit and encourage any inquiry or the making of any proposal or offers that could constitute an Acquisition Proposal." The Merger Agreement defines "Acquisition Proposal" broadly as

> any bona fide inquiry, proposal or offer from any person or group of persons other than Parent or one of its subsidiaries for, in one transaction or a series of related transactions, (A) a merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving an acquisition of the Company (or any subsidiary or subsidiaries of the Company whose business constitutes 15% or more of the net revenues, net income or assets of the Company and its subsidiaries, taken as a whole) or (B) the acquisition in any manner, directly or indirectly, of over 15% of the equity securities or consolidated total assets of the Company and its subsidiaries, in each case other than the Merger.

MA § 6.5(d)(i). Once the go-shop period ended, Del Monte was bound by a customary no-solicitation clause that prohibited Del Monte, among other things, from "initiat[ing], solicit[ing], or knowingly encourage[ing] any inquiries or the making of any proposal or offer that constitutes or rea-sonably could be expected to lead to an Acquisition Proposal." *Id.* § 6.5(b). The no-solicitation clause permits Del Monte to respond to a Superior Proposal, defined generally as an Acquisition Proposal (but with the references to 15% changed to 50%) that the Board determines is "more favorable to the Company's stockholders from a financial point of view" than the Merger and "is reasonably likely to be consummated." *Id.* § 6.5(d)(iii).

During the go-shop period, Del Monte was authorized to, among other things, waive or release any party from any pre-existing standstill agreements with the Company, and Del Monte could do so "at its sole discretion." *Id.* § 6.5(a). This is a salutary provision that eliminates any argument from the acquirer that it has an explicit or implicit contractual veto over the decision to grant a waiver or release. Exercising this authority, Del Monte released Carlyle, CVC, Apollo, and Campbell's Soup from the standstill provisions in the confidentiality agreements they executed in February 2010.

Section 8.3(a) of the Merger Agreement permits Del Monte to terminate its deal with KKR to accept a Superior Proposal prior to the stockholder vote on the merger if

> (i) the Company Board authorizes the Company, subject to complying with the terms of this Agreement, to enter into one or more Alternative Acquisition Agreements with respect to a Superior Proposal; (ii) immediately prior to or substantially concurrently with the termination of this Agreement the Company enters into one or more Alternative Acquisition Agreements with respect to a Superior Proposal; and (iii) the Company immediately prior to or substantially concurrently with such termination pays to Parent or its designees in imme-

diately available funds any fees required to be paid pursuant to Section 8.5. *Id.* § 8.3(a). Prior to exercising the termination right, Del Monte must have given KKR written notice describing the material terms and conditions of the Superior Proposal and negotiated with KKR in good faith for three business days to enable KKR to match the Superior Proposal. *Id.* § 6.5(h). The match right must be complied with for each change in the financial terms of or other material amendment to the Superior Proposal, except that after the first match the three business day period becomes two business days. *Id.*

If Del Monte terminates the Merger Agreement to enter into a transaction with an Excluded Party—defined generally as a person or group who made an Acquisition Proposal during the go-shop period—then Del Monte owes KKR a termination fee in the amount of $60 million, representing 1.13% of total deal value and 1.5% of equity value, or approximately $0.312 per share. *Id.* § 8.5(b). If Del Monte terminates the Merger Agreement to enter into a transaction with a party other than an Excluded Party, then the termination fee increases to $120 million, representing 2.26% of total deal value, 3.0% of the total equity value, and approximately $0.624 per share. *Id.*

The Board decided to let Barclays run the go-shop. In carrying out this assignment, Barclays had a direct financial conflict. In its role as sell-side financial advisor, Barclays had earned $2.5 million for its fairness opinion (despite the conflict of interest giving rise to the need for a second banker) and would earn another $21 million if the deal closed. For its role in the buy-side financing for KKR, Barclays stood to earn another $21 to $24 million. As Ben acknowledged, Barclays would earn substantially more for executing the LBO with KKR than it would for any other strategic alternative. If another bidder emerged that did not need financing or who chose not to use Barclays, then Barclays would lose its buy-side financing fees. Martin testified that it "never occurred to us that [Barclays] wouldn't do a good job." Martin Tr. 64.

Other advisors were available. Perella Weinberg had rendered the second fairness opinion necessitated by Barclays' conflict and could have handled the process. Goldman Sachs had a prior relationship with Del Monte and independently approached Del Monte about managing the go-shop. Upon learning of Goldman's interest, Barclays told KKR that Goldman was trying to "scare up competition." PX 32 ("Goldman has been pushing the company to help run their go-shop and scare up competition against us (!) . . . ."). Brown of KKR told Barclays that he would "manage it" directly with Goldman. *Id.* He solved the problem by letting Goldman participate in 5% of the syndication rights for the acquisition financing, which "squared things away there." PX 33. After that, Goldman dropped its efforts to conduct the go shop.

During the go-shop period, Barclays contacted fifty-three parties, including thirty strategic buyers. Three requested and were provided with confidentiality agreements. Two parties from the early 2010 process re-engaged. No one expressed interest.

## K. The Proxy Supplement

On January 12, 2011, Del Monte issued its definitive proxy statement on Schedule 14A. Many of the disclosures about the background of the transaction were false and misleading, in part because Barclays hid its behind-the-scenes activities from the Board. On February 4, after the completion of discovery in connection with the preliminary injunction application, Del

Monte issued the Proxy Supplement to moot the plaintiffs' disclosure claims. The Proxy Supplement disclosed that the Company learned significant facts about Barclays' role and interactions with KKR only as a result of this litigation.

Among other things, the Proxy Supplement disclosed the following:

- "Since the filing of the Definitive Proxy Statement, the Company has learned that as early as January 2010, representatives of Barclays Capital had indicated their intent to seek to participate as a financing source in connection with any future transaction pursued by the Company subject to the internal approval of Barclays Capital and subject to the approval of the Company if Barclays Capital were also acting as financial advisor to the Company." Proxy Supp. at 2.

- "Since the filing of the Definitive Proxy Statement by the Company, the Company has learned that financing sources other than Barclays Capital could have provided sufficient financing for the transaction at $19.00 per share without the participation of Barclays Capital." *Id.* at 4.

- "Since the filing of the Definitive Proxy Statement, the Company has learned that beginning in August 2010 and September 2010, after Barclays Capital's engagement with the Company had formally concluded, Barclays Capital had routine business development discussions with, among others, KKR and Vestar, concerning potential strategic opportunities, including a potential acquisition of the Company. In the course of the discussions between Barclays Capital and Vestar, Barclays Capital and Vestar discussed that KKR/Centerview would be a good partner with Vestar and a good strategic match with Vestar if the potential

for a transaction involving the Company arose. At the time of these discussions, Barclays Capital believed that Vestar and KKR/Centerview had prior discussions about potential opportunities in the consumer sector, including the possibility of an acquisition of the Company if the opportunity re-emerged. The Company also has learned since the filing of the Definitive Proxy Statement that, subsequent to the routine business development discussions in August and September 2010 discussed above, KKR/Centerview and Vestar had discussions about working together on an indication of interest regarding a transaction with the Company." *Id.* at 2–3.

- "Since the filing of the Definitive Proxy Statement, the Company has learned that during the period between October 11, 2010 and the week of November 8, 2010 there were discussions among the sponsors concerning the conversations between KKR/Centerview and the Company and about potentially adding Vestar as an acquisition partner at a later point in time in the event negotiations progressed with the Company." *Id.* at 3.

The defendants released this information on the afternoon of Friday, February 4, 2011, apparently expecting that stockholders could digest it, determine how to vote, and either submit proxies or revocations or appear and vote at the special meeting on Tuesday, February 15. In light of the relief granted, I need not separately consider whether the timing and manner of dissemination were adequate under the circumstances.

## II. LEGAL ANALYSIS

■ To obtain a preliminary injunction, the plaintiffs must demonstrate (i) a reasonable probability of success on the mer-

its; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.,* 506 A.2d 173, 179 (Del.1986). The plaintiffs have met the first and second elements. After due consideration of the third element, I find that the circumstances call for a limited injunction along the lines the plaintiffs have requested.

## A. The Probability of Success on the Merits

The first element of the familiar injunction test requires that the plaintiffs establish a reasonable probability of success on the merits. This showing "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made." *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 579 (Del.Ch.1998) (internal quotation marks omitted). Because the disclosure claims have been mooted, the pertinent claims are (i) breach of fiduciary duty against the director defendants and (ii) aiding and abetting by KKR.

### 1. The Breach of Fiduciary Duty Claim

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.,* 2011 WL 303207, at *8 (Del.Ch. Feb. 1, 2011). Delaware applies enhanced scrutiny when directors face potentially subtle structural or situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference. *Id.* at *8–10; *see Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 42 (Del.1994) [hereinafter, *"QVC"*] ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable.").

Enhanced scrutiny has both subjective and objective components. Initially, the directors "bear the burden of persuasion to show that their motivations were proper and not selfish." *Mercier v. Inter–Tel (Del.), Inc.,* 929 A.2d 786, 810 (Del.Ch.2007). Adapted to the M & A context, the directors must show that they sought "to secure the transaction offering the best value reasonably available for the stockholders." *QVC,* 637 A.2d at 44. The key verb is "sought." Time-bound mortals cannot foresee the future. The test therefore cannot be whether, with hindsight, the directors actually achieved the best price. "Rather, the duty can only be to try in good faith, in such a setting, to get the best available transaction for the shareholders. Directors are not insurers." *Citron v. Fairchild Camera and Instrument Corp.,* 1988 WL 53322, at *16 n. 17 (Del. Ch. May 19, 1988) (Allen, C.); *accord In re Dollar Thrifty S'holder Litig.,* 2010 WL 3503471, at *32 (Del.Ch. Sept. 8, 2010).

Having made the necessary subjective showing, the directors next must demonstrate that "their actions were reasonable in relation to their legitimate objective." *Mercier,* 929 A.2d at 810. The directors bear the burden of proving that they (i) followed a reasonable decision-making process and based their decisions on a reasonable body of information, and (ii) acted reasonably in light of the circumstances then existing. *QVC,* 637 A.2d at 45. The reasonableness standard permits a reviewing court to address inequitable action even when directors may have sub-

jectively believed that they were acting properly.[2] That said, the objective standard does not permit a reviewing court to freely substitute its own judgment for the directors'.

> [A] court applying enhanced judicial scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45 (emphasis in original). Put differently, enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del.Ch.2005); accord *Dollar Thrifty*, 2010 WL 3503471, at *17 ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."). What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or

disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process. *See Dollar Thrifty*, 2010 WL 3503471, at *18–19; *Toys "R" Us*, 877 A.2d at 1000–01.

■ In evaluating the adequacy of the directors' decision-making and the information they had available, a reviewing court necessarily will consider the extent to which a board has relied on expert advisors. When responding to a takeover bid or considering a final-stage transaction, the directors' advisors play a pivotal role.

> Frequently, the outside directors who find themselves in control of a corporate sale process have had little or no experience in the sale of a public company. They are in *terra incognito* [sic]. Naturally, they turn for guidance to their specialist advisors who will typically have had a great deal of relevant experience.

William T. Allen, *Independent Directors In MBO Transactions: Are They Fact or Fantasy?*, 45 Bus. Law.2055, 2061 (1990). "It is obvious that no role is more critical with respect to protection of shareholder interests in these matters than that of the expert lawyers [and here I add financial advisors] who guide sometimes inexperienced directors through the process." *In re Fort Howard Corp. S'holders Litig.*,

---

**2.** *See, e.g., Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del.Ch. Jan. 14, 1991) ("[O]ccasions do arise where board inaction, even where not inequitable in purpose or design, may nonetheless operate inequitably."); *id.* at *7 n. 9 ("To be 'inequitable', such conduct does not necessarily require a dishonest, selfish, or evil motive."); *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1121 (Del.Ch.1990) (Allen, C.) ("Fiduciaries who are subjectively operating selflessly might be pursuing a purpose that a court will rule is inequitable."); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 663 (Del.Ch.1988)

(Allen, C.) (holding that, where board acted with purpose of interfering with shareholder vote, "even finding the action taken was taken in good faith, it constituted an unintended violation of the duty of loyalty that the board owed to the shareholders" and noting "parenthetically that the concept of an unintended breach of the duty of loyalty is unusual but not novel"). Each of these cases involved the question of injunctive relief; none addressed the separate issue of whether defendant directors could be held liable for monetary damages.

1988 WL 83147, at *12 (Del.Ch. Aug. 8, 1988) (Allen, C.).

Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts.[3] This Court has not stopped at disclosure, but rather has examined banker conflicts closely to determine whether they tainted the directors' process.[4]

In *Toys "R" Us*, Vice Chancellor Strine considered whether an investment bankers role in providing stapled financing created a conflict of interest that merited injunctive relief. At the outset of the sale process challenged in that case, the sell-side investment banker, First Boston, asked about possibly providing buy-side financing for purchasers of a subsidiary. "The board promptly nixed that idea." 877 A.2d at 1005. Then, following a lengthy process during which the form of the transaction

shifted from a sale of the subsidiary to a sale of the whole company, and two months after the process culminated in an executed merger agreement, First Boston again asked to be permitted to provide a portion of the buy-side financing. This time the board agreed. Vice Chancellor Strine described that decision as "unfortunate, in that it tends to raise eyebrows by creating the appearance of impropriety, playing into already heightened suspicions about the ethics of investment banking firms." *Id.* at 1006. He suggested it would have been "[f]ar better, from the standpoint of instilling confidence, if First Boston had never asked for permission, and had taken the position that its credibility as a sell-side advisor was too important in this case, and in general, for it to simultaneously play on the buy-side in a deal when it was the seller's financial advisor." *Id.* He likewise noted that "it might have been better, in view of First Boston's refusal to refrain, for the board of the Com-

---

**3.** *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009) (emphasizing importance of disclosure of potential banker conflict of interest and explaining that "[t]here is no rule ... that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict"); *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del.Ch. June 27, 2008) ("[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.... For that reason, the ... benefits of the Merger to [the investment bankers,] beyond its expected fee, must also be disclosed to ... stockholders."); *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del.Ch.2007) (requiring disclosure of CEO conflict of interest where CEO acted as negotiator; "Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price,

because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

**4.** *See Ortsman v. Green*, 2007 WL 702475, at *1 (Del.Ch. Feb. 28, 2007) (ordering expedited discovery where target's financial advisor participated in the buy-side financing even though company retained a separate financial advisor to render a fairness opinion); *Khanna v. McMinn*, 2006 WL 1388744, at *25 (Del. Ch. May 9, 2006) (finding plaintiffs had raised facts sufficient to "create a reasonable doubt that the transaction was the product of a valid exercise of business judgment" where investment bank provided a bridge loan to the target and thus had an interest in ensuring the closing of the transaction); *In re Prime Hospitality, Inc. S'holders Litig.*, 2005 WL 1138738, at *12 (Del.Ch. May 4, 2005) (rejecting settlement of *Revlon* claim and questioning "how can the Court attribute weight to the notion that Bear Stearns [the allegedly conflicted banker] was retained by Prime to shop the company?").

pany to have declined the request, even though the request came on May 12, 2005, almost two months after the board had signed the merger agreement." *Id.* Nevertheless, after reviewing in detail the public, year-long, multi-phase process that the board and its banker conducted, Vice Chancellor Strine concluded "upon close scrutiny" that First Boston's appearance of conflict did not have "a causal influence" on the boards process. *Id.* He cautioned that "[i]n general, however, it is advisable that investment banks representing sellers not create the appearance that they desire buy-side work, especially when it might be that they are more likely to be selected by some buyers for that lucrative role than by others." *Id.* at 1006 n. 46.

Applying these principles to the current case shows that Barclays' activities went far beyond what took place in *Toys "R" Us*. Barclays set out to provide acquisition financing, as established by the internal screening memos from January and March 2010. Barclays' Del Monte coverage officer pitched a Del Monte LBO to KKR, Apollo, and other private equity firms that would be likely to use Barclays for acquisition financing. Once it secured the sell-side role, Barclays structured a small, private process that maximized the likelihood that it could provide acquisition financing. Barclays never disclosed to the Board its interactions with the private equity shops or its desire to provide acquisition financing.

After the early 2010 process terminated, Barclays became more aggressive. In September, Barclays paired up Vestar and KKR in violation of their confidentiality agreements with Del Monte. Barclays then assisted Vestar and KKR in preparing an indication of interest. After being re-engaged by Del Monte, Barclays again did not disclose its interactions with the banks or its plan to secure a buy-side role,

and it actively concealed the fact that Vestar and KKR were working together. When KKR "formally requested" permission to make a joint bid with Vestar, Barclays did not come clean, and Del Monte agreed without seeking to extract any pro-stockholder concession or other advantage. Before the Merger Agreement was signed and with price negotiations still on-going, Barclays sought and obtained a buy-side role and worked with KKR to develop financing. As a result, at the same time Barclays ostensibly was negotiating to get KKR to pay more, Barclays had an incentive as a well-compensated lender to ensure that a deal was reached and that KKR did not overpay.

But for Barclays' manipulations, the Del Monte process would have played out differently. If the directors had known at the outset of Barclays' intentions and activities, the Board likely would have hired a different banker. Del Monte had good relationships with Goldman Sachs and Bank of America/Merrill Lynch, and the Board easily could have tapped either firm. Even if the directors decided to proceed with Barclays, the Board and its experienced counsel doubtless would have taken steps to protect the integrity of the process. As soon as Barclays disclosed its buy-side aspirations, the Board likely would have followed *Toys "R" Us* and "nixed that idea." The Board and its counsel likely also would have limited the role of Barclays lending group, chaperoned its discussions with bidders, or used another bank to provide confidential feedback to the potential sponsors about leverage parameters and market expectations.

Although Barclays' activities and non-disclosures in early 2010 are troubling, what indisputably crossed the line was the surreptitious and unauthorized pairing of Vestar with KKR. In doing so, Barclays materially reduced the prospect of price

competition for Del Monte. Vestar had been the high bidder in the early 2010 process, and although Vestar needed a partner, a non-conflicted financial advisor could have teamed Vestar with a different sponsor. It was to address precisely this risk of competition-limiting behavior that Del Monte secured the No Teaming Provision. Barclays' efforts caused Vestar and KKR to violate the No Teaming Provision. Most egregiously, Barclays actively concealed the pairing from the Del Monte Board. It was not until the week of November 8 that KKR "formally requested" to be allowed to partner with Vestar. Barclays continued to hide its involvement and recommended that the pairing be permitted.

The record does not reflect meaningful Board consideration or informed decision-making with respect to the Vestar pairing. There are no minutes that suggest hard thinking about how acceding to KKR's request might affect Del Monte. Martin testified about the issue as follows:

Q. The next paragraph [of the proxy] starts off, it says, "Later during the week of November 8, 2010, KKR and Centerview approached Barclays Capital about the possibility of including Vestar in the deal as an additional member of the sponsor group. Representatives of KKR indicated that Vestar's prior experience in the food industry would make them an ideal partner for KKR/Centerview in connection with a potential investment in the Company. After discussions between KKR, Centerview and the Company, the Company permitted KKR and Centerview to approach Vestar to become an additional member of the sponsor group." Do you see that?

A. I do.

Q. Did that happen at a Board meeting?

A. I don't recall.

Q. Do you recall the Board approving the concept of KKR contacting Vestar and getting them involved as part of the KKR group?

A. I don't recall that.

Q. Do you recall how it happened?

A. I do not.

Q. When is the first time you heard about it?

A. I don't remember.

Q. Do you recall the Board ever authorizing KKR in writing at any time prior to the week of November 8, 2010 to communicate with Vestar about teaming up to buy Del Monte?

A. I do not recall anything of that nature.

Q. Was there any discussion at the Board level of whether it was advisable to allow a company that previously had been bidding against KKR in the January, early January process, to now instead team up with KKR in the late 2010 process?

[DEFENSE COUNSEL]: Objection.

A. I don't remember any conversations about that.

Martin Tr. 49–51. It was not reasonable for the Board to accede to KKR's request and give up its best prospect for price competition without making any effort to obtain a benefit for Del Monte and its stockholders.

Barclays similarly crossed the line with its late-stage request for permission to be one of KKR's lead banks. There was no deal-related reason for the request, just Barclays' desire for more fees. Del Monte did not benefit. The immediate consequence was to force Del Monte to spend $3

million to hire a second bank. The more serious consequence was to taint the final negotiations. At the time Barclays made its request, the Merger Agreement was not yet signed, and Barclays and KKR were still negotiating over price. Barclays' internal documents from January and March 2010 had stated that "Barclays will look to participate in the acquisition financing once the Company has reached a definitive agreement with a buyer." But Barclays could not wait.

In considering Barclays' request, the Board again failed to act reasonably. The Board did not ask whether KKR could fund the deal without Barclays' involvement, and Del Monte did not learn until this litigation that Barclays was not needed on the buy-side. If the Board had refused Barclays' request, then Del Monte could have had a non-conflicted (or at least not directly conflicted) negotiator bargain with KKR. Without some justification reasonably related to advancing stockholder interests, it was unreasonable for the Board to permit Barclays to take on a direct conflict when still negotiating price. It is impossible to know how the negotiations would have turned out if handled by a representative that did not have a direct conflict. The burden of that uncertainty must rest with the fiduciaries who created it.

Finally, Barclays' conflict tainted the go-shop process. What Barclays did looks good on the surface, but the "who" is as important as the "what." As Vice Chancellor Strine explained in *Netsmart*, "body language" can be critical. *In re Netsmart Techs., Inc. S'holder Litig.*, 924 A.2d 171, 188 (Del.Ch.2007). There, a special committee permitted the company's CEO to drive a sale process involving private equity bidders who likely would retain management.

In easily imagined circumstances, this approach ... could be highly problematic. If management had an incentive to favor a particular bidder (or type of bidder), it could use the ... process to its advantage, by using different body language and verbal emphasis with different bidders. "She's fine" can mean different things depending on how it is said.

*Id.* at 194. I recognize that the level of interaction in the due diligence meetings discussed in *Netsmart* differs from what takes place in a go-shop, particularly in the early outreach phase, but an analogous principle applies.

The Strategic Committee delegated the task of running the go-shop to Barclays and had no direct insight into how Barclays interacted with the parties it contacted. Barclays had a strong interest in ensuring that a particular kind of buyer (private equity) acquired Del Monte and a keen desire to see the deal close with KKR. In the last two years, Barclays has earned $66 million from KKR. If another bidder declined or did not need Barclays' financing, the bank would lose half of the approximately $44.5 to $47.5 million that Barclays stands to earn from its dual role. To recoup the lost financing fees, Barclays would have had to find a bidder willing to pay between $24.25 and $26 per share, or an additional $1.2 and $1.4 billion. Not likely.

Although the blame for what took place appears at this preliminary stage to lie with Barclays, the buck stops with the Board. Delaware law requires that a board take an "active and direct role in the sale process." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989). "[T]he role of outside, independent directors becomes particularly important because of the magnitude of a sale of control transaction and the possibility, in

certain cases, that management [and here I add other contingently compensated professionals like investment banks] may not necessarily be impartial." *QVC*, 637 A.2d at 44.

This is a case like *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del. 1989), in which the Delaware Supreme Court held that injunctive relief was required when a board's lack of involvement in a sale process enabled management and their financial advisor to steer the deal to KKR, their preferred bidder. In *Mills*, management's conflict arose out of their buy-side interest in a leveraged buyout sponsored by KKR. *Id.* at 1272. Management tainted the sale process by communicating with KKR without board approval and clandestinely passing information to KKR about the bidding process. *Id.* at 1275. Despite their independence, the directors failed adequately to oversee the process and permitted the conflicted management team and their financial advisor to exploit the opportunities it presented. *Id.* at 1280–81, 1284 n. 32.

In enjoining the proposed transaction, the Delaware Supreme Court spoke directly to the implications of a board being misled by conflicted individuals:

> [W]hen corporate directors rely in good faith upon opinions or reports of officers and other experts "selected with reasonable care," they necessarily do so on the presumption that the information provided is both accurate and complete. Normally, decisions of a board based upon such data will not be disturbed when made in the proper exercise of business judgment. However, when a board is deceived by those who will gain from such misconduct, the protections girding the decision itself vanish. Decisions made on such a basis are voidable at the behest of innocent parties to whom a fiduciary duty was owed and

breached, and whose interests were thereby materially and adversely affected.

*Id.* at 1283–84. The Delaware Supreme Court also addressed the role of management's financial advisor, finding that the board's reliance on his advice "share[d] the same defects" as the board's reliance on conflicted management. *Id.* at 1284 n. 33.

■ Here, the taint of self-interest came from a conflicted financial advisor rather than from management. Like the directors in *Mills*, the Del Monte Board was deceived. At a minimum, Barclays withheld information about its buy-side intentions, its involvement with KKR, and its pairing of KKR and Vestar. As in *Mills*, "there can be no dispute but that such silence was misleading and deceptive. In short, it was a fraud upon the board." *Id.* at 1283. I therefore conclude that the plaintiffs have established a reasonable likelihood of success on the merits of their claim that the director defendants failed to act reasonably in connection with the sale process. This does not mean that any director necessarily will face money damages. The question currently before the Court is whether there is a sufficient likelihood of success on the merits to support injunctive relief, and that is all I address. *See id.* at 1284 n. 32.

### 2. The Aiding and Abetting Claim

■ The plaintiffs claim that KKR aided and abetted the directors' breaches of fiduciary duty. "[T]he four elements of an aiding and abetting claim [are] (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001) (internal quotation omitted). The critical element is "knowing participation."

A third-party bidder who negotiates at arms' length rarely faces a viable claim for aiding and abetting. "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach. Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting." *Id.* at 1097. The "long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting helps to safeguard the market for corporate control by facilitating the bargaining that is central to the American model of capitalism." *Morgan v. Cash,* 2010 WL 2803746, at *8 (Del.Ch. July 16, 2010) (internal footnotes omitted). *See also Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *16 (Del.Ch. Apr. 5, 1990) (granting summary judgment in favor of defendant Dow on claim of aiding and abetting breach of fiduciary duty because "what Dow essentially did [in the transaction] was to simply pursue arm's-length negotiations with Morton Thiokol through their respective investment bankers in an effort to obtain . . . the best price that it could.").

Despite the general rule, "a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board. Similarly, a bidder may be liable to a target's stockholders for aiding and abetting a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach." *Malpiede,* 780 A.2d at 1097–98 (internal footnotes omitted). An acquirer is free to seek the lowest possible price through arms' length negotiations with the target board, but "it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders." *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1058 (Del.Ch.1984), *aff'd* 575 A.2d 1131 (Del.1990). Creating or exploiting a fiduciary breach is not part of legitimate arm's-length bargaining; it is an impermissible intrusion into the relationship between the fiduciary and beneficiary.

KKR knowingly participated in Barclays' self-interested activities. When Barclays secretly paired Vestar with KKR in September 2010, KKR knew it was bound by the No Teaming Provision and was barred from discussing a Del Monte bid with anyone absent prior written permission from Del Monte. KKR nevertheless worked with Barclays and Vestar on a joint bid and agreed to keep Vestar's involvement hidden from the Board. KKR also knowingly participated in the creation of Barclays' buy-side conflict. Before the Board had cleared Barclays to provide financing to KKR, Barclays and KKR had agreed that Barclays would be one of the lead banks. KKR necessarily knew that Barclays would not push as hard in the price negotiations when it stood to earn substantial fees from both sides of a successful deal. KKR later ensured that a conflicted Barclays would run the go-shop when KKR "squared things away" with Goldman for 5% of the syndication, ending Goldman's interest in running the go-shop process. On this record, the plaintiffs have established a reasonable likelihood of success on the merits of their claim that KKR aided and abetted the breaches of fiduciary duty that resulted from Barclays' misconduct.

**B. Irreparable Harm**

The second requirement for a preliminary injunction is a showing of irrepa-

rable injury if the injunction is not granted. *Revlon,* 506 A.2d at 179. Harm is irreparable unless "alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin,* 770 A.2d 536, 557 (Del.Ch. 2000) (internal quotations and citations omitted).

 Absent an injunction, the Del Monte stockholders will be deprived forever of the opportunity to receive a pre-vote topping bid in a process free of taint from Barclays' improper activities. The threatened foreclosure of this unique opportunity constitutes irreparable injury. *See Hollinger Intern., Inc. v. Black,* 844 A.2d 1022, 1090 (Del.Ch.2004) ("[T]here is no doubt International faces irreparable injury. Without an injunction, it will be practically impossible to rescind the Barclays Transaction, the Strategic Process will be undermined, and International will lose the unique opportunities the Process may develop.").

Absent an injunction, Del Monte's stockholders still could seek monetary damages. That inquiry, however, would "have to involve imprecise estimates," such as deriving the price Del Monte's stockholders might have received in an untainted process and comparing that to what they actually received. *Id.* Because of the obvious difficulties presented by this inquiry, stockholders "face a threat of irreparable harm when a seller's board breaches its *Revlon* duties by failing to adequately shop the company in advance of recommending that stockholders tender their shares to a chosen bidder." *In re Cogent, Inc. S'holder Litig.,* 7 A.3d 487, 515 (Del.Ch.2010). "No doubt there is the chance to formulate a rational remedy down the line, but that chance involves great cost, time, and, unavoidably, a large degree of imprecision and

speculation. After-the-fact inquiries into what might have been had directors tested the market adequately ... necessarily involve[s] reasoned guesswork." *Netsmart,* 924 A.2d at 207.

Defenses to monetary damages further weigh in favor of pre-vote relief. Exculpation under Section 102(b)(7) can render empty the promise of post-closing damages. *See* 8 *Del. C.* § 102(b)(7); *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 244 (Del.2009). For directors who have relied on qualified advisors chosen with reasonable care, Section 141(e) provides another powerful defense. *See* 8 *Del. C.* § 141(e); *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 59–60 (Del.2006). In such cases, "the shareholders' only realistic remedy for certain breaches of fiduciary duty in connection with a sale of control transaction may be injunctive relief." *Police & Fire Ret. Sys. of the City of Detroit v. Bernal,* 2009 WL 1873144, at *3 (Del.Ch. June 26, 2009). In this action, unless post-closing discovery reveals additional facts, the plaintiffs face a long and steep uphill climb before they could recover money damages from the independent, outside directors on the Board. Admittedly other prospects for recovery are not so remote. By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters, and disgorgement of transaction-related profits may be available as an alternative remedy. That said, the skilled lawyers who represent KKR and Barclays doubtless will have many arguments against liability.

The unique nature of a sale opportunity and the difficulty of crafting an accurate post-closing damages award counsel heavily in favor of equitable relief. The plaintiffs have shown the necessary threat of irreparable harm.

## C. Balancing of Hardships

█ The final element of the injunction standard is the balancing of hardships:

[A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a . . . remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

*Lennane v. ASK Computer Sys., Inc.*, 1990 WL 154150, at *6 (Del.Ch. Oct. 11, 1990) (Allen, C.). This element is by far the most difficult.

On the one hand, without an injunction, Del Monte's stockholders will lose forever the chance for a competitive process that could lead to a higher sale price for their company. On the other hand, granting an injunction jeopardizes the stockholders' ability to receive a premium for their shares. No one disputes, and the evidence establishes, that $19 is an attractive price. Any delay subjects the Merger to market risk. All else equal, a longer delay means greater risk. There is also the difficult question of the parties' contract rights, which Delaware courts strive to respect.

When there is no competing proposal, this Court rarely will enjoin a premium transaction pending trial. *See, e.g., Kohls v. Duthie*, 765 A.2d 1274, 1289 (Del.Ch. 2000); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1990 WL 131351, at *9 (Del.Ch. Sept. 6, 1990). To issue such an injunction requires both "a special conviction about the strength of the legal claim asserted" and "a strong sense that the risks in granting the preliminary relief of a[n] untoward financial result from the stockholders' point of view [are] small."

*Solash v. Telex Corp.*, 1988 WL 3587, at *13 (Del.Ch. Jan. 19, 1988) (Allen, C.).

At the same time, this Court has issued preliminary injunctions designed to cure pre-vote harm. Preliminary injunctions against merger votes pending the issuance of curative disclosures offer the prime example. Injunctions of that sort subject transactions to incremental market risk. *See Simonetti*, 2008 WL 5048692, at *14. They likewise interfere, albeit to a minor degree, with the parties' standard contract right to have the merger vote as soon as reasonably practicable. *See, e.g.,* MA § 6.2. Nevertheless, this Court has been willing to issue disclosure-based injunctions that delay transactions for as much as twenty days. *See La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1192 (Del.Ch.2007).

The plaintiffs ask me to enjoin the vote on the Merger for a meaningful period during which a competing bidder may come forward. The plaintiffs have proposed a delay of 30 to 45 days, derived from the 45–day length of the earlier go-shop period. To further remove the taint of Barclays' involvement, they ask that the parties be enjoined from enforcing the deal protections in the Merger Agreement during that period.

At this stage, it is not possible to remedy fully the effects of Barclays' maneuvers without blocking the deal and sending the parties back to the drawing board. I cannot, for example, split up the Vestar/KKR team and induce a topping bid from Vestar and a different partner. An injunction along the lines requested by the plaintiffs does not perfectly remedy the harm Barclays caused, but it does go part of the way. The core injury inflicted on the stockholders was Barclays' steering the deal to KKR. Barclays won by doubling up on fees. KKR won by getting Del Monte, free of meaningful competition, and secur-

ing a leg-up on potential competing bidders through the defensive measures in the Merger Agreement. The injunction sought by the plaintiffs partially cures this injury by limiting KKR's leg-up and providing a final window during which a topping bid could emerge.

■■■ I do not believe that a 30 to 45 day delay is warranted. A postponement of this length might be appropriate if Del Monte never had been exposed to the market. The reality is that although a conflicted banker conducted the go-shop process, the Del Monte transaction was shopped actively for 45 days. Since the go-shop process ended on January 10, 2011, the Company has been subject to an additional passive market check. A further delay of 30 to 45 days ignores the fact that many potential bidders have already evaluated this opportunity. I will therefore enjoin the merger vote for a period of only 20 days, which should provide ample time for a serious and motivated bidder to emerge. The resulting delay is comparable to the disclosure injunction in *Crawford.*

I agree with the plaintiffs that during the pre-vote period, the parties to the Merger Agreement should be enjoined from enforcing the deal protection measures. These measures are not being enjoined because they coerce stockholders, preclude any alternative to the board's chosen transaction, or otherwise fall outside the range of reasonableness. The go-shop lasted 45 days, during which the termination fee was $60 million, or 1.13% of transaction value ($4 billion of equity plus $1.3 billion of debt). After the go-shop, the termination fee increases to $120 million, or 2.26% of total deal value. If included in an arms' length deal untainted by self-interest, the defensive measures would be quite reasonable. *See Dollar Thrifty,* 2010 WL 3503471, at \*23–32 (discussing alleged preclusiveness of termination fee); *Toys "R" Us,* 877 A.2d at 1015–22 (providing guidance on parameters for termination fees).[5]

Rather, the provisions are being enjoined because they are the product of a fiduciary breach that cannot readily be remedied post-closing after a full trial. KKR secured the deal protection measures as part of a negotiation that was tainted by Barclays' conflict. KKR should not benefit from the misconduct in which it participated.

■■■ The traditional deference given to agreements freely negotiated between sophisticated parties is limited by fiduciary principles. "Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." *NACCO Indus., Inc. v. Applica Inc.,* 997

5. That said, KKR's last two bid increases were 25 cents each. The Board has trumpeted its insistence on those increases as evidence of its (and implicitly Barclays') good faith. The go-shop period termination fee would require a competing bidder to top by more than a 25 cent increment. The post go-shop fee would require a bidder to top by over 50 cents. A strategic bidder that could generate incremental value from synergies might not be deterred. A private equity firm that uses the same models and strategies as KKR might view the fee differently. This in turn suggests (i) the importance of the pre-signing phase to developing price competition among private equity bidders, and (ii) the value of actual or *de facto* exclusivity to a private equity buyer. *See* Guhan Subramanian, *Go-Shops vs. No-Shops in Private Equity Deals: Evidence and Implications,* 63 Bus. Law. 729, 759 (2008) (arguing that exclusivity is a valuable benefit "and therefore should be paid for"). When an independent and active board has been assisted by non-conflicted advisors, a Delaware court rarely will have cause to second guess this type of tactical decision. *See Toys "R" Us,* 877 A.2d at 1000.

A.2d 1, 35 (Del.Ch.2009). Sophisticated businesses can "make their own judgments about the risk they should bear," and those contractual expectations should be respected. *Abry P'rs V, L.P. v. F&W Acq. LLC,* 891 A.2d 1032, 1061 (Del.Ch.2006). In the deal context, "[p]arties bargain for provisions in acquisition agreements because those provisions mean something." *NACCO,* 997 A.2d at 19. It is "critical to our law that those bargained-for rights be enforced, both through equitable remedies such as injunctive relief and specific performance, and, in the appropriate case, through monetary remedies including awards of damages." *Id.*

 When a party aids and abets a breach of fiduciary duty, however, the contract rights that the aider and abetter secures as a result of the interaction must give way to the superior equitable rights and interests of the beneficiaries. *See QVC,* 637 A.2d at 50–51; *ACE Ltd. v. Capital Re Corp.,* 747 A.2d 95 (Del.Ch. 1999); *see also* Restatement (Second) of Contracts § 193 (1981) ("A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy."). In *QVC,* the Delaware Supreme Court rejected the argument that vested contract rights took precedence over a fiduciary breach. 637 A.2d at 51. The Supreme Court held that because the buyer knew it was participating in a breach of fiduciary duty when it negotiated the underlying deal, the buyer could not "be now heard to argue that it obtained vested contract rights by negotiating and obtaining contractual provisions from a board acting in violation of its fiduciary duties." *Id.* The Supreme Court therefore preliminarily enjoined the no-shop provision and the termination fee and affirmed the Court of Chancery's preliminary injunction

against enforcement of a stock-option lockup. *Id.* at 36–37, 50–51.

In *ACE,* Vice Chancellor Strine discussed the tension between contract rights and the fiduciary duties owed to stockholders. In considering a buyer's attempt to enforce a no-shop clause, Vice Chancellor Strine noted that "there are many circumstances in which the high priority our society places on the enforcement of contracts between private parties gives way to even more important concerns." 747 A.2d at 104. He cited four factors that bear on the analysis:

> (1) whether the acquiror knew, or should have known, of the target board's breach of fiduciary duty; (2) whether the ... transaction remains pending or is already consummated at the time judicial intervention is sought; (3) whether the board's violation of fiduciary duty relates to policy concerns that are especially significant; and (4) whether the acquiror's reliance interest under the challenged agreement merits protection in the event the court were to declare the agreement enforceable.

*Id.* at 105–06 (citing Paul L. Regan, *Great Expectations? A Contract Law Analysis for Preclusive Corporate Lock-ups,* 21 Cardozo L.Rev. 1, 116 (1999)). After balancing the factors, Vice Chancellor Strine held that the contract provision could not be enforced as the buyer advocated because the stockholders' interests would take precedence. *Id.* at 106–10.

Applying the *ACE* factors to this case indicates that KKR's "bargained-for rights" should give way. First, as discussed above in the analysis of the aiding and abetting claim, KKR knew of and knowingly participated in the breach of duty. KKR knew that making Barclays one of its lead banks on the deal would give Barclays a direct conflict of interest at a time when KKR and Barclays were still

negotiating over price. KKR knew that Barclays paired it with Vestar in violation of both firms' confidentiality agreements with Del Monte. KKR knew that the No Teaming Provision only be could waived by Del Monte in writing, that consent had not been given, and that the purpose of the provision was to prevent anticompetitive bidding alliances. KKR knew that Barclays subsequently concealed Vestar's involvement from Del Monte and agreed with Moses to keep Vestar out of meetings with Del Monte where Vestar's involvement would be discovered. KKR knew that the Vestar pairing served KKR's best interests. During the early 2010 process, Brown of KKR worried about Vestar partnering with another firm and wrote that KKR needed to be careful about this possibility.

Second, the Merger is still pending. The stockholder vote is currently scheduled for February 15, 2011, and the drop-dead date is May 22, 2011. As in *ACE*, "[t]he merger has not closed, the eggs have not been 'scrambled,' and the court would not be in the position of unscrambling them. Put another way, the transaction has not gotten to the point where [KKR's] investment and settled expectations in the deal are so substantial that it is unfair for [its] contract rights to give way to the interests of [Del Monte's] shareholders." 747 A.2d at 109.

Third, "the board's violation of fiduciary duty relates to policy concerns that are especially significant." *Id.* at 106. "[F]iduciary responsibilities are of special importance in situations where a board is entering into a transaction as significant as a merger affecting stockholder ownership rights." *Id.* at 109. Delaware has a strong interest in policing the behavior of fiduciaries who agree to final-stage transactions. *See McMullin v. Beran*, 765 A.2d 910, 918 (Del.2000). This is particularly so

when the illicit behavior is secretive and subversive, yet appears to elicit yawns from Wall Street players who regard it as par for the course. After Vice Chancellor Strine's comments about buy-side participation in *Toys "R" Us*, investment banks were on notice. Delaware's strong interest in policing the behavior of fiduciaries and their advisors is the "(sometimes unspoken) reason [that] our law has subordinated the contract rights of third party suitors to stockholders' interests in not being improperly subjected to a fundamental corporate transaction as a result of a fiduciary breach by their board." *ACE*, 747 A.2d at 109.

The fourth factor is "whether the acquiror's reliance interest under the challenged agreement merits protection in the event the court were to declare the agreement unenforceable." *Id.* at 106. It is intended to account for the reliance interests of a "wholly innocent" acquiror who "was without knowledge or constructive notice" of the breach. Regan, *supra*, at 107–08. KKR is not such a party.

Lastly, in balancing the equities, I have considered whether a preliminary injunction of this nature would give KKR the right to terminate the Merger Agreement. If the Merger Agreement is not consummated by May 22, 2011, then both parties can walk. MA § 8.2(a). Prior to the drop-dead date, each party is obligated to use its reasonable best efforts to consummate the Merger. *Id.* § 6.8(a). The injunction will lift in twenty days, over two months before the drop-dead date.

The preliminary injunction will not cause the deal to fail because a closing condition cannot be met by the drop-dead date. Section 7.1(c) provides as a condition to closing that "[n]o court or other Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law (whether tempo-

rary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits consummation of the Merger." *Id.* § 7.1(c). Twenty days from now, the preliminary injunction will lift and there will be no injunction then "in effect" that would restrain, enjoin, or otherwise prohibit consummation of the Merger.

The preliminary injunction will not, itself, give either party the right to terminate. Section 8.2 provides that either party may terminate the Merger Agreement if "any Order *permanently* restraining, enjoining or otherwise prohibiting consummation of the Merger shall become final and non-appealable." *Id.* § 8.2 (emphasis added). I have not permanently enjoined the Merger.

The defendants have suggested that a preliminary injunction limiting the deal protection provisions might invalidate the entire agreement because of the following non-severability language in Section 9.4: "[T]he parties intend that the remedies and limitations thereon contained in Section 8.5(d) be construed as an integral provision of this Agreement and that such remedies and limitations shall not be severable in any manner that increases a party's liability or obligations hereunder or under the Financing Commitments or the Guarantees." The short answer is that I am not enjoining Section 8.5(d), which is a sole and exclusive remedy provision, but rather Section 8.5(b). A longer answer would need to address the question of whether a proven aider and abetter (and we are currently at a preliminary stage) could rely on such a provision.

If KKR attempts to terminate the Merger Agreement, then Del Monte has remedies. Under certain circumstances, KKR will owe Del Monte a reverse termination fee of $249 million. *See id.* § 8.4(c). Del Monte can also seek specific performance of KKR's obligations. *See id.* § 9.10.

## D. The Injunction Bond

 Under Court of Chancery Rule 65(c), "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." As the Delaware Supreme Court recently explained, "[a] party that is wrongfully enjoined may recover damages resulting from the injunction, but that recovery is limited to the amount of the bond." *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 469 (Del.Supr.2010). Because I am enjoining the defendants, Rule 65(c) requires that I focus on the costs and damages that may be incurred or suffered by them.

The parties have not presented evidence on this issue. Pointing to the magnitude of the deal premium over the pre-announcement market price, the defendants seek a bond in the amount of $1,076,612,698.80. There is some irony in the magnitude of the request, because the parties agreed in the Merger Agreement that "[a]ny party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction." MA § 9.10. Admittedly that provision addressed a different species of claim, but it suggests how seriously the parties took the need for a billion-dollar bond.

The premium over market price might well be one measure of damages to the stockholder class if the deal were lost, but that is a different question than the harm an improvidently granted injunction could inflict on the defendants. KKR necessari-

ly believes that Del Monte is or could be made to be worth more than $19 per share, otherwise KKR would not have entered into the transaction. If the deal were lost, KKR would be deprived of that additional value. Although I have evidence of the healthy internal rates of return that KKR thinks it can achieve, KKR has not quantified its anticipated profits for purposes of a bond. The individual defendants stand to receive some transaction-related benefits, but they have not argued for a bond based on those amounts.

Importantly, and consistent with *Solash* and its progeny, I am not enjoining the transaction from closing pending the outcome of a trial. Rather, I am imposing a delay akin to a disclosure-based injunction. When those injunctions issue, this Court has required at most a nominal bond. *See Simonetti*, 2008 WL 5048692, at *14 n. 68(noting that a large bond for a disclosure injunction would be "unprecedented"). Even when transactions have been enjoined on substantive grounds, bonds traditionally have been small. *See, e.g., Levco Alternative Fund, Ltd. v. Reader's Digest Ass'n*, 2002 WL 31835461, at *1 (Del.Ch. Aug. 14, 2002) (conditioning injunction against recapitalization on bond of $5,000); *Solar Cells, Inc. v. True N. P'rs, LLC*, 2002 WL 749163, at *8 (Del.Ch. Apr. 25, 2002) (conditioning injunction against merger on bond of $2,500). In one case, this Court conditioned a deal-blocking injunction on a $500,000 bond. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1218 & n. 1 (Del.1999) (describing bond). The outlier is *Gimbel v. Signal Co.*, 316 A.2d 599 (Del.Ch.1974), *aff'd*, 316 A.2d 619 (Del. 1974). The *Gimbel* Court required a $25

million bond as a condition to a preliminary injunction blocking a $480 million transaction where the transactional premium was $75 million. *Id.* at 618.

Although I have not enjoined the deal, I have enjoined the $120 million termination fee that KKR otherwise would receive in the event of a topping bid. That figure strikes me as the best starting point for pricing the risk of a wrongful injunction. The likelihood of a topping bid, however, is low.[6] With KKR as the buyer and a market check (albeit a tainted one) already completed, a topping bid seems all the less likely. I will not be surprised if no one emerges. The amount of the bond should take into account the low probability of actual harm. There is likewise the need to balance the risk of chilling the socially-beneficial and wealth-enhancing efforts of responsible plaintiffs' counsel to remedy and deter breaches of fiduciary duty against the problem of over-incentivizing deal litigation by giving entrepreneurial law firms a free option to enjoin transactions. Lacking guidance from the parties as to an alternative figure that reflects the threatened harm to the defendants, and having attempted to balance the competing policy considerations in a rough and imperfect way, I set bond at $1.2 million, representing 1% of the enjoined termination fee.

## III. CONCLUSION

The defendants are enjoined from proceeding with the stockholder vote on the Merger for a period of twenty days. To the extent the defendants wish to convene the meeting of stockholders on February 15, 2011, and adjourn it to a later date

---

**6.** *See* Subramanian, *Go–Shops vs. No–Shops, supra*, 63 Bus. Law. at 747 (finding deal-jump rate in private equity deals of 8% where deal lacks a go-shop, 5% where deal involved private pre-signing market canvass plus go-shop, and 17% where single-bidder deal was followed by go-shop); John C. Coates IV & Guhan Subramanian, *A Buy–Side Model of M & A Lockups: Theory and Evidence*, 53 Stan. L.Rev. 307, 371 (2000) (finding deal-jump rate of 3–7%).

without holding the vote, they may freely do so. Pending the vote on the Merger, the defendants are enjoined from enforcing Section 6.5(b), (c) and (h), and Section 8.5(b) of the Merger Agreement. The injunction is conditioned on plaintiffs posting bond in the amount of $1.2 million. **IT IS SO ORDERED.**