**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| TEUZA – A FAIRCHILD TECHNOLOGY VENTURE LTD., Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0130-SG |
| MARK LINDON, MICHAEL DREYER, ANOOSHEH BOSTANI, DAVID SCOTT, NICHOLAS TERRAFRANCA, JOSEPH RUBLE, ALFRED E. MANN TRUST, MANN GROUP, LLC, BIOVENTUS LLC, AND BIOVENTUS INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: January 19, 2023
Date Decided: April 27, 2023

Stephen E. Jenkins & Samuel M. Gross, ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Donald J. Enright, Elizabeth K. Tripodi, and Jordan A. Cafritz, LEVI & KORSINSKY, LLP, Washington, D.C., *Attorneys for Plaintiff.*

Raymond J. DiCamillo, Kevin M. Gallagher, and Kyle H. Lachmund, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Adam H. Offenhartz & M. Jonathan Seibald, GIBSON, DUNN & CRTUCHER LLP, New York, New York, *Attorneys for Defendants Michael Dreyer, Anoosheh Bostani, Alfred E. Mann Trust, and Mann Group, LLC.*

Kevin M. Coen & Stephanie Rudolph, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendants Bioventus LLC and Bioventus Inc.*

Scott B. Czerwonka & Andrea S. Brooks, WILKS LAW, LLC, Wilmington, Delaware, *Attorneys for Defendant Mark Lindon*.

Kurt M. Heyman & Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: John F. Baughman & Daniel A. Schwartz, JFB LEGAL, PLLC, Norfolk, Virginia, *Attorneys for Defendants David Scott, Nicholas Terrafranca, and Joseph Ruble*.

**GLASSCOCK, Vice Chancellor**

Before me are motions to dismiss a complaint that alleges a straightforward tale of self-dealing by a controller in the context of a merger. The matter is complicated by the fact that entities—a trust and an LLC—separate the human controllers from the controlled entity. Nonetheless, the complaint largely clears the low hurdle of plausibility[1] presented by Rule 12(b)(6). The simple facts involve related entities under common control, one of which controlled the Delaware corporation at issue, Bioness Inc., the other constituting its largest creditor. The allegations are that, in the auction of Bioness, the controllers decisively favored the bidder that provided a better deal for the creditor, at the expense of the minority stockholders.

There are four motions to dismiss pending before me. This memorandum opinion resolves these motions.

## I. BACKGROUND[2]

Bioness (the "Company") was founded in 2004 as a joint venture between Alfred E. Mann and Neuromuscular Electrical Systems Ltd., an Israeli medical device manufacturer.[3] Neuromuscular Electrical Systems later became the

---

[1] By which I mean reasonable conceivability.

[2] The facts in this section are drawn from the First Am. Verified Class Action Compl. for Breach of Fiduciary Duty (the "Compl."), Dkt. No. 14. I find that the complaint also incorporates certain documents by reference, including various loan agreements and the merger agreement with Bioventus. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d at 808, 818 (Del. 2013) (holding that a plaintiff cannot prevent the court from considering a document the plaintiff extensively references in its pleadings).

[3] Compl. ¶ 1.

Company's subsidiary and the former stockholders, including Plaintiff Teuza, were granted representation on the Company's board (the "Board").[4] The former stockholders' representative was Avi Kerbs.[5] Kerbs served continuously on the Board from his appointment until the Company's sale in March 2021, which is the subject of this litigation.[6]

Mann served as the Company's chairman until 2013 and as an actively engaged director until his death in February 2016.[7] Mann was also the Company's controlling stockholder, holding a majority of the Company's stock through the California-based Alfred E. Mann Trust (the "Trust"), here a Defendant.[8] Following Mann's death, the Trust continued as an administrative trust administered by Defendants Michael Dreyer and Anoosheh Bostani (the "Trustees"), both California residents.[9]

In addition to his significant equity holdings, Mann was also the Company's primary creditor. Prior to his death, Mann had loaned $133 million in principal to the Company through Mann Group, LLC (the "LLC"), a Delaware-based investment

---

[4] *Id.* ¶¶ 1-2.
[5] *Id.* ¶ 2.
[6] *Id.* ¶¶ 2, 114.
[7] *Id.* ¶ 3.
[8] *Id.* ¶¶ 3, 14, 26.
[9] *Id.* ¶¶ 3-4; Opening Br. of Defs. Michael Dreyer, Anoosheh Bostani, Alfred E. Mann Trust, and Mann Group LLC in Supp. of Their Mot. to Dismiss (the "Mann Defs. OB") at 20, Dkt. No. 34 (the residency of the Trustees is not disputed by Plaintiff).

vehicle he controlled.[10]  At the time of the merger, the Company owed the LLC approximately $273 million, including interest.[11]  Per Plaintiff, no interest was ever paid on the LLC's loans to the Company "and there was no expectation by Mr. Mann that the loans would ever be repaid."[12]  Instead, Mann's reasons for funding this medical device company were purportedly purely philanthropic.[13]

Following Mann's death, Trustees Dreyer and Bostani wielded control over the Company via the Trust, while also controlling the LLC as its managers.[14] Plaintiff alleges that the Trustees leveraged this position of power to push the Company into a series of transactions that favored the LLC's interests as a creditor to the common stockholders' detriment.  This began with the appointment of Defendant Mark Lindon as a director and, later, chairman of the Company.[15]  With Lindon's assistance, in August 2017 the Individual Defendants caused the Company and the LLC to execute an all-assets security agreement.[16]  This agreement was accompanied by a promissory note that purported to incorporate all the LLC's loans

---

[10] Compl. ¶¶ 3-4, 17; Ex. 1 through 11 to Transmittal Aff. of Kevin M. Gallagher, Esq. in Supp. of Defs. Michael Dreyer's, Anoosheh Bostani's, Alfred E. Mann Trust's, and Mann Group LLC's Opening Br. in Supp. of their Mot. to Dismiss ("Defs.' Ex.") 82 (pages numbered sequentially based on PDF), Dkt. No. 36.

[11] Defs.' Ex. at 5.

[12] Compl. ¶¶ 3 n.3, 26, 27.

[13] *Id.* ¶ 3 n.3.

[14] *Id.* ¶ 4.

[15] *Id.* ¶ 34.

[16] *Id.* ¶ 35.

since 2008.[17] Two weeks later, the LLC filed a UCC-1 statement under which it claimed a security interest in all of the Company's assets, including in its intellectual property.[18] The LLC had never previously claimed a security interest in the Company's intellectual property.[19] Per Plaintiff, the Board neither knew of nor approved any of these steps to consolidate and secure the LLC's debt.[20]

Plaintiff alleges that Defendants subsequently used this enhanced leverage to obtain interest rate increases, block the Board's efforts to obtain outside financing, and, ultimately, push through a sale unfavorable to common stockholders.[21] In August 2020, the LLC informed the Company that it would not offer additional loans.[22] The Company responded by seeking alternative sources of funding.[23] In September, Defendants rejected an outside investor group's proposal involving a combination of new loans and stock issuance, instead demanding an outright sale of the Company.[24] In November, the Company agreed to a preliminary term sheet with Kuhn Global Capital LLC ("Kuhn"), which contemplated a $750,000 bridge loan

---

[17] *Id.*
[18] *Id. ¶ 36.*
[19] *Id. ¶¶ 30-33, 36.*
[20] *Id. ¶¶ 35, 36.*
[21] *Id. ¶¶ 36, 40.*
[22] *Id. ¶ 40.*
[23] *Id. ¶ 41.*
[24] *Id.*

4

accompanied by a one-year non-binding option for Kuhn to acquire the Company for either $75 million or a future royalties-based amount.[25]

On December 24, 2020, the Board was presented with a fully negotiated letter of intent from a new potential acquirer, Bioventus (the "LOI").[26] The LOI contemplated that Bioventus would lend the Company $1.5 million and acquire all outstanding Company stock for $35 million in cash at closing, with potential earn-outs of up to $65 million.[27] Of the $35 million due at closing, $20.5 million would pay off non-LLC loans and other expenses, with the remaining $14.5 million going to the LLC.[28] Any earn-outs would go to the LLC in their entirety.[29] The stockholders would get nothing.[30] The LOI also contained a stringent no-shop provision, which prohibited solicitation of or communications regarding alternative acquisition proposals.[31] This provision also prohibited the Company from taking on new loans, unless they came from the LLC.[32] Though negotiations with Kuhn were ongoing, the Board approved the LOI the same day it was received and without substantive discussion.[33]

---

[25] *Id.* ¶ 43; Defs.' Ex. at 105-07.
[26] Compl. ¶ 45.
[27] Compl. ¶ 45; Defs.' Ex. at 109-13.
[28] *Id.* ¶ 48.
[29] *Id.*
[30] *Id.* ¶ 46-47.
[31] *Id.* ¶ 46.
[32] *Id.*
[33] *Id.* ¶ 45.

Pursuant to the LOI, the Board formed a committee (the "Committee") to recommend whether a sale of the Company should proceed and to negotiate any such sale.[34] Despite the fact that Defendant Lindon continued to represent the Trust in a variety of legal and consulting matters, which had led him to recuse himself from at least one previous Trust-related board decision,[35] he was nonetheless appointed to lead the Committee.[36] The Committee subsequently revised the proposed Bioventus merger agreement to reduce the consents required from Company stockholders.[37] Per Plaintiff, this ensured that sufficient consents could be obtained from stockholders under the thumb of the Trust and LLC.[38] The Committee also "failed to even attempt to negotiate any benefit for the minority stockholders[.]"[39]

Lindon and the Trustees also took steps to enforce the LOI's no-shop provision that limited minority stockholders' ability to seek out a more favorable deal. In the immediate aftermath of the Board's approval of the LOI, Lindon sent a cease-and-desist email to director Kerbs, who represented a block of minority stockholders including Plaintiff Teuza.[40] In the cease-and-desist email, Lindon warned that Kerbs could face legal liability for seeking an alternative to the

---

[34] *Id.* ¶ 52.
[35] *Id.* ¶¶ 10, 52.
[36] *Id.* ¶ 52.
[37] *Id.* ¶ 54.
[38] *Id.*
[39] *Id.* ¶ 56.
[40] *Id.* ¶¶ 2, 62-64.

6

Bioventus deal.[41] Lindon also advised the Trustees to limit alternative deal discussions with Kerbs in order to discourage "an offer from Avi [Kerbs], Kuhn or some new group."[42] For its part, the Trust made its position clear, writing to Teuza's counsel that the Trust "'will not engage with your clients about any transaction that could facilitate potential alternatives to Bioventus acquiring Bioness or that otherwise interferes with the sale process[.]'"[43]

Undeterred, Kerbs continued to work to identify alternatives to the Bioventus deal.[44] These efforts resulted in a competing offer from Accelmed (the "Accelmed Offer"), which was comprised of an initial payment of $60 million and earnout payments that "presented the possibility that the total equity value could exceed $200 million."[45] Importantly, the Accelmed Offer also gave the minority stockholders the opportunity to remain as stockholders post-closing.[46] Bioventus countered by increasing the initial payment component of its offer by $10 million.[47] In exchange, it demanded an expedited closing, later adding a new no-shop provision that would

---

[41] *Id.* ¶ 64.
[42] *Id.* ¶ 62.
[43] *Id.* ¶ 65.
[44] *Id.* ¶ 69.
[45] *Id.* ¶ 70. Because the complaint is inconsistent with its chronology, it is unclear whether this was an initial offer or a final one. *Compare id.* ¶ 70 *with id.* ¶ 92 (indicating that the Accelmed offer was updated, though the iterative differences are never discussed).
[46] *Id.* ¶ 70.
[47] *Id.* ¶ 71.

only expire after the planned closing date.[48] Accelmed responded by unilaterally presenting improved proposals throughout March 2021.[49] Despite this new competition, the Company remained resolutely focused on a Bioventus deal.[50]

From February to March 2021, there had been significant turnover in the Board, with non-party directors Jim McHargue and William Dearstyne, as well as Defendant Mark Lindon, all resigning within a six-week period.[51] These directors represented a majority of the Committee,[52] and their replacements were appointed by the Trust.[53] The newly appointed directors were Defendants David Scott, Nicholas Terrafranca, and Joseph Ruble (together, the "Replacement Directors").[54] Per Plaintiff, the Company took no steps to screen the Replacement Directors for conflicts.[55] The Replacement Directors uniformly supported the no-shop agreement with Bioventus and refused to consider alternative transactions.[56] The Replacement Directors justified these positions by claiming that the Company was on the brink of bankruptcy and that the Accelmed Offer was too risky.[57] Plaintiff points out that

---

[48] *Id.* The Bioventus counteroffer made no mention of a no-shop provision. *Id.* ¶ 78. Instead, the initial draft of the no-shop agreement was presented by the *Company's* counsel on the Company's letterhead. *Id.* ¶ 79.

[49] *Id.* ¶ 72.

[50] *Id.* ¶ 79.

[51] *Id.* ¶ 75.

[52] *Id.* ¶ 81.

[53] *Id.* ¶¶ 75, 81. It appears that, following these departures, the Company abandoned the transaction committee structure. Instead, the merger was put to a vote of the full Board. *Id.* ¶ 93.

[54] *Id.* ¶¶ 11-13, 75.

[55] *Id.* ¶ 81.

[56] *Id.* ¶ 82.

[57] *Id.*

8

Teuza had already committed to a $6 million loan to give the Board sufficient time to consider competing offers, while Accelmed itself had offered millions in loans to guarantee employee salaries pending closing.[58]

On March 27, the Board entered into the revised no-shop agreement with Bioventus.[59] Two days later, Accelmed submitted a revised offer that, in addition to increased merger consideration, committed to agree to the deal terms the Company had worked out with Bioventus without due diligence and upon only 24 hours of review.[60] During a March 28 Board meeting to discuss the competing offers, the Replacement Directors and director Robert Perry, together a majority, took the position that the no-shop agreement prohibited the Company from engaging with Accelmed.[61] Thus, despite Accelmed's commitments, the Board took the position that the Bioventus deal was preferable because it offered greater certainty.[62]

On March 30, Accelmed delivered its final proposal, which added a waiver of closing conditions.[63] The Board rejected the proposal outright,[64] instead voting 3-1 to approve the Bioventus merger and declare it advisable to the Company's

---

[58] *Id.* ¶ 84.
[59] *Id.* ¶ 85.
[60] *Id.* ¶ 87.
[61] *Id.* ¶ 88.
[62] *Id.* ¶ 91.
[63] *Id.* ¶ 92.
[64] *Id.*

9

stockholders.[65]  Thus, the Board approved the Bioventus deal without having ever communicated with Accelmed regarding *any* of its offers.[66]  In addition, the stockholder consents approving the merger had been signed prior to both the submission of Bioventus' revised offer and the Board's recommendation to stockholders.[67]

Under the deal consummated on March 31,[68] the LLC would receive the lion's share of consideration, while the Company's minority stockholders would receive just $5 million of the $45 million upfront payment and 2.5% of the $65 million in contingent payments.[69]  After approving the merger, the Board proceeded to award each of the directors $75,000 for their "service."[70]  Following the merger, distributions of merger consideration to minority stockholders' have allegedly been conditioned on the waiver of any claims against certain Defendants.[71]

---

[65] *Id.* ¶ 93. Kerbs was the only dissenting vote. This vote also approved and declared advisable a number of transactions associated with the merger itself. *Id.*  Additionally, at this meeting the Board members universally expressed doubt that the milestones associated with the contingent payment component of Bioventus' deal could be achieved. *Id.* ¶ 104.  However, the fairness opinion provided by the Company's financial advisor, upon which the Board presumably relied, was premised on the achievement of these milestones. *Id.*

[66] *Id.* ¶ 92.  The Board also failed to wait for or consider other interested parties, at least three of which were exploring potential transactions. *Id.* ¶¶ 106, 119.

[67] *Id.* ¶ 94.

[68] *Id.* ¶ 114.

[69] *Id.* ¶¶ 98-99.

[70] *Id.* ¶ 100.

[71] *Id.* ¶ 121.  Plaintiff's indiscriminate use of "Controller" throughout the complaint to refer to some combination of the LLC, Trust, and Trustees obscures the key differences between these parties and their various responsibilities.

## II. ANALYSIS

All Defendants have moved to dismiss the amended complaint (the "Complaint") under Rule 12(b)(6).[72] The Trustees, Defendants Dreyer and Bostani, have also moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2).[73] I begin my analysis with the threshold issue of personal jurisdiction, before evaluating whether the Complaint states a claim upon which relief may be granted.

*A. The Trustees' Motion under Rule 12(b)(2)*

The Defendants contest this Court's personal jurisdiction over Dreyer and Bostani, both of whom reside in California. Plaintiff argues that jurisdiction was either conferred by the merger agreement or is otherwise proper under a theory of conspiracy jurisdiction.[74] I find that the Plaintiff has made allegations that support jurisdictional discovery and grant leave accordingly.

Plaintiff contends that, "[b]y consenting to the exclusive jurisdiction in the Merger Agreement, the Mann entities and the Trustees have submitted to Delaware jurisdiction for matters related to the merger."[75] However, Dreyer and Bostani

---

[72] Defs. David Scott, Nicholas Terrafranca and Joseph Ruble's Opening Br. in Supp. of Their Mot. to Dismiss, Dkt. No. 30 (the "Director Defs. OB"); Def. Mark Lindon's Opening Br. in Supp. of his Mot. to Dismiss, Dkt. No. 31 (the "Lindon OB"); Opening Br. of Defs. Bioventus LLC and Bioventus Inc. in Supp. of Their Mot. to Dismiss, Dkt. No. 33 (the "Bioventus OB"); Mann Defs. OB.

[73] Mann Defs. OB at 19-26.

[74] Pl.'s Answering Br. in Opp. to Defendant Michael Dreyer, Anoosheh Bostani, Alfred E. Mann Trust, Mann Group LLC, David Scott, Nicholas Terrafranca, and Joseph Ruble's Mot. to Dismiss (the "PL Combined AB") at 15-20, Dkt. No. 49.

[75] *Id.* at 19.

signed the merger agreement on behalf of the Trust and the LLC, respectively, rather than in their personal capacities.[76] This Court has held that individuals signing agreements on behalf of an entity are generally not themselves subject to forum selection provisions contained therein.[77] Accordingly, I find that the merger agreement does not confer personal jurisdiction over the Trustees.

Plaintiff further argues that personal jurisdiction over the Trustees is proper under a theory of conspiracy jurisdiction. The Delaware Supreme Court codified that theory in *Istituto Bancario*, holding that:

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[78]

---

[76] Ex. 12 through 13 to Transmittal Aff. of Kevin M. Gallagher, Esq. in Supp. of Defs. Michael Dreyer's, Anoosheh Bostani's, Alfred E. Mann Trust's, and Mann Group LLC's Opening Br. in Supp. of their Mot. to Dismiss ("Defs.' Ex. 12 & 13") at 74-75 (pages numbered sequentially based on PDF), Dkt. No. 36.

[77] *See Morrison v. Berry*, 2020 WL 2843514, at *15 n.210 (Del. Ch. June 1, 2020) (finding no personal jurisdiction over individual who signed on behalf of a trust); *see also Ruggiero v. FuturaGene*, plc., 948 A.2d 1124, 1132 (Del. Ch. 2008) (finding no jurisdiction where individuals signed on behalf of an entity).

[78] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

"Although *Istituto Bancario* literally speaks in terms of a 'conspiracy to defraud,' the principle is not limited to that particular tort."[79] In subsequent cases, this Court has held that a fiduciary duty claim can satisfy this element.[80] As a result, my findings below of a sufficient pleading that the Trust and Trustees breached their fiduciary duties, aided and abetted by the LLC, provide a sufficient basis to infer a conspiracy, of which the Trustees were members, to push through a transaction unfavorable to the stockholders.[81]

The third element is a closer issue. The Complaint does not provide a thorough "factual showing" that the Trustees' actions create a nexus sufficient to support personal jurisdiction. However, the Plaintiff's allegations do provide grounds to conduct jurisdictional discovery.[82] Accordingly, the Plaintiff may explore the connections between the Trustees and the sale to Bioventus for the purpose of demonstrating personal jurisdiction.

*B. Defendants' Motions to Dismiss under Rule 12(b)(6)*

Delaware courts apply a well-settled standard to motions to dismiss under Rule 12(b)(6). Specifically, the court will "(1) accept all well pleaded factual

---

[79] *Harris v. Harris*, 289 A.3d 310, 339 (Del. Ch. 2023) (citation omitted).

[80] *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635-36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016).

[81] The absence of an explicit conspiracy claim is not fatal for jurisdictional purposes. *See Harris*, 289 A.3d 341.

[82] *Accord Harris*, 289 A.3d 342.

13

allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party."[83]  I begin my analysis with the central breach of fiduciary duty claims against the Mann Defendants, from which most of the second order causes of action derive.

### 1. Count IV: Breach of Fiduciary Duty (Against Dreyer, Bostani, and the Trust)

Count IV asserts a claim for breach of the duty of loyalty against the Trust and Trustees for pushing through a conflicted transaction as the Company's controlling stockholder.[84]  As the holder of a majority of the Company's stock, it is indisputable that the Trust was a controlling stockholder.[85]  Controlling stockholders owe fiduciary duties to both the corporation and to its minority stockholders.[86]  As the "ultimate human controller[s]" who purportedly set the conflicted transaction into motion, the Trustees also owed the Company fiduciary duties, despite "participat[ing] in the transaction through intervening entities."[87]  Thus, the operative question is whether the Complaint supports a pleadings-stage finding that

[83] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).
[84] Compl. ¶¶ 141-46.
[85] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006); Compl. ¶ 148.
[86] *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 712 (Del. Ch. 2023).
[87] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016).

the Trust and Trustees breached their fiduciary duties by entering a conflicted transaction with the Company.

Where a company engages in a transaction in which a controlling stockholder receives a non-ratable benefit, the applicable standard of review is entire fairness.[88] Here, although the controller and the recipient of the non-ratable benefit are separate entities—the Trust and the LLC—both are directly controlled by the Trustees. I find that this relationship, combined with the asymmetrical distribution of merger consideration,[89] is sufficient at the pleadings stage to draw a reasonable inference that the Trust or Trustees derived a non-ratable benefit from the consideration paid to the LLC. As a result, the appropriate standard of review is entire fairness and the motion to dismiss Count IV must be denied.[90]

### 2. Count V: Breach of Fiduciary Duty (Dreyer, Bostani, and the Trust)

In Count V, Plaintiff brings a so-called *Primedia*[91] claim seeking recovery for pre-merger derivative claims relating to the Trust and Trustees' purported efforts to

---

[88] *Id.* at *30.

[89] Indeed, absent some other source of benefit, the Trustees' decision to have the Trust forgo its rightful share of merger consideration is facially inconsistent with the Trustees' fiduciary duties to the Trust.

[90] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). Putting aside Plaintiff's allegations of imperfect director independence and uninformed stockholder votes, *MFW* cleansing is not available here due to the lack of an independent special committee. *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) (outlining the process by which a conflicted squeeze-out merger can be cleansed back to business judgment review), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018). Recognizing this, Defendants make no attempt to argue that *MFW* should apply. *See* Mann Defs. OB at 43-48.

[91] *See In re Primedia, Inc. Shareholders Litig.*, 67 A.3d 455 (Del. Ch. 2013).

15

consolidate, secure, and weaponize the LLC's debt.[92]   That is, Plaintiff seeks to preserve choses-in-action that it contends existed and were not accounted for in the sale to Bioventus.

A claim under the rubric of *Primedia* requires the plaintiff to allege: (1) a viable derivative claim, (2) that is material to the overall transaction, and (3) that will not be pursued by the buyer and is not reflected in the merger consideration.[93] Plaintiff's vague and conclusory arguments, which largely relate to acts outside the statute of limitations, fail to satisfy the "stringent standards" required of a *Primedia* claim and must be dismissed.[94]  However, to the extent that these allegations are not time barred, Plaintiff is free to rely on them as evidence of unfair price or unfair process.

### 3. Count VI: Aiding & Abetting Breach of Fiduciary Duty (Against Dreyer, Bostani, and the LLC)

A cause of action for aiding and abetting breach of fiduciary duty requires a plaintiff to plead facts supporting "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach."[95]   The duty, breach, and damages elements are fulfilled by my finding that the Trust and Trustees

---

[92] Compl. ¶¶ 147-152; PL Combined AB at 44-46.

[93] *Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121, 127 (Del. 2021).

[94] PL Combined AB at 44-46; *In re Orbit/FR, Inc. Stockholders Litig.*, 2023 WL 128530, at *3 (Del. Ch. Jan. 9, 2023).

[95] *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

owed and breached fiduciary duties to the Company in the squeeze-out merger. Defendants argue that Plaintiff fails to carry its burden on the "knowing" element.[96] To the extent that I understand this argument, it is tacitly premised on the idea that Dreyer and Bostani, controlling the LLC as its managers, were unaware of what Dreyer and Bostani were doing in their capacity as Trustees. The inference, obviously, is otherwise.

The Complaint thus states a claim for aiding and abetting breach of fiduciary duty against both the Trustees and the LLC. While the claim against the Trustees may well be rendered redundant by my finding that they owed and breached fiduciary duties directly to the Company,[97] I retain the aiding and abetting claim against them, at this pleading stage, as an alternative cause of action.

### 4. Count VII: Unjust Enrichment (Against the LLC)

A cause of action for unjust enrichment, pled here against the LLC, requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[98] Plaintiff argues that, by agreeing to the LOI, the LLC bindingly agreed to cap the consideration it would receive at $14.5 million.[99] The increased

---

[96] Mann Defs. OB at 52.
[97] *See CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015).
[98] *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).
[99] Compl. ¶ 48; PL Combined AB at 46-48.

consideration the LLC received under Bioventus's subsequent improved offer violated this purported agreement and was, per Plaintiff, an enrichment.[100] Putting aside the fact that the LOI was explicitly non-binding,[101] the Plaintiff's "unjust enrichment" claim is effectively a cause of action for breach of contract. Even assuming such a binding contract existed, a claim for such a breach would inhere in Bioventus or, perhaps, the Company, but not in Plaintiff. Accordingly, Count VII is dismissed.

### 5. Count I: Promissory Estoppel (Against the LLC)

Plaintiff argues that the LLC is estopped from seeking repayment of its loans to the Company because Mr. Mann never expected repayment. A promissory estoppel claim requires a plaintiff to show that "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[102] Putting aside the parties' various

---

[100] PL Combined AB at 46-47.
[101] Defs.' Ex. at 113; *see ev3, Inc. v. Lesh*, 114 A.3d 527, 530 n.7 (Del. 2014) (holding that letters of intent are generally nonbinding). Plaintiff's answering brief conspicuously avoids addressing Defendants' arguments on this issue. PL Combined AB 47-48.
[102] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347-48 (Del. 2013).

arguments around timeliness[103] and contract integration,[104] Plaintiff fails to show that Mann's statements constituted "a real promise, not just mere expressions of expectation, opinion, or assumption."[105]

Plaintiff's argument is that Defendants have taken actions inconsistent with a "reasonably definite and clear"[106] promise by Mr. Mann to never seek repayment for his loans to the Company.[107] Plaintiff's core piece of evidence for this promise is the following email, sent to Kerbs in 2014:

> Avi, I advanced my loans to Bioness to support operation of the company with full understanding of the risk and the possibility that might not collect it at all. I had actually tried to write off 25 million in late 2012 but there were some significant obstacles under US tax law. Of course I want to be able to use any write of [sic] efficiently.
>
> I want Bioness to succeed and am committed to create value for our stockholders. If needed I am prepared to write off some or even all of those loans but do not want to do anything formally until we are operationally secure. I am very pleased with the progress but I am not yet ready to make a final adjustment.

---

[103] Defendants argue that Plaintiff should have sued in 2017, when the first actions inconsistent with the alleged promise were taken. Mann Defs. OB at 27-28; Reply Br. of Defs. Michael Dreyer, Anoosheh Bostani, Alfred E. Mann Trust, and Mann Group LLC in Supp. of their Mot. to Dismiss (the "Mann Defs. RB") at 11-13, Dkt. No. 60. Plaintiff counters that it could not have known of these actions and that the statute of limitations should be tolled. PL Combined AB at 50-52. I decline to address these arguments because, to the extent they are appropriate at the pleadings stage, they are mooted by Plaintiff's failure to plead the elements of promissory estoppel.

[104] Defendants also contend that promissory estoppel does not govern where there is an integrated, enforceable contract. Mann Defs. OB at 30-31; Mann Defs. RB at 14. Here, however, the pleadings raise questions about the enforceability of those contracts, given the alleged lack of board approval. *See* Compl. ¶¶ 30-36. Because the events in question took place in 2017, this argument again raises timeliness issues.

[105] *See James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (quoting *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del.Ch. Mar.18, 2009)).

[106] *Id.*

[107] PL Combined AB at 52-53.

I realize the loans give you some difficulty; I just have to find the best method and the right time to resolve all that.[108]

While the email does raise the possibility of full loan forgiveness, it is hedged in layer upon layer of conditionality. Qualifiers like "possibility," "if needed," "until," "not ready yet," and "right time" undermine Plaintiff's contention that Mann would *never* seek repayment. As a result, even at the pleadings stage, I am unable to find that the Plaintiff has shown that Mann made a reasonably definite promise not to seek repayment sufficient to support an estoppel claim. Count I is therefore dismissed.

### 6. Count X: Breach of Contract (Against the Trust, the LLC, Bioventus LLC, and Bioventus Inc.)

Count X alleges that the Trust and the LLC breached the merger agreement by refusing to pay out merger consideration to certain minority stockholders.[109] Defendants contend that no breach has occurred, because release of consideration was contractually conditioned on a waiver of claims, known and unknown, which Plaintiff has declined to sign.[110] Plaintiff counters that the waiver is likely unenforceable.[111]

---

[108] Compl. ¶ 27.
[109] Compl. ¶¶ 172-76.
[110] Mann Defs. OB at 55-57.
[111] PL Combined AB at 56-57.

20

Plaintiff has raised sufficient questions about the waiver's coerciveness and enforceability to merit examination on a more developed record. I am therefore denying the Mann entities' motion to dismiss with regard to Count X, which may be reviewed on summary judgment as appropriate.

Count X is also pled against Bioventus.[112] Bioventus argues that no breach has occurred, because under the relevant section of the merger agreement, Bioventus's only obligation (which it completed) was to pay $5 million to the Company or to the designated paying agent, who would then handle distribution.[113] Plaintiff's response fails to address Bioventus's core argument.[114] A review of the merger agreement, which is part of the record at this stage, substantiates Bioventus's position.[115] Accordingly, Count X is dismissed with respect to Bioventus.

### 7. Count VIII: Aiding and Abetting Breach of Fiduciary Duty (Against Bioventus)

While the existence of a fiduciary relationship and a breach of duty have been established, at least at this pleadings stage, Plaintiff fails to adequately allege that

---

[112] Count X names both Bioventus Inc. and Bioventus LLC, a Bioventus subsidiary through which Bioventus Inc. acquired the Company. Compl. ¶¶ 18-19, 96, 173. I refer to them as a single defendant for the purposes of both this and subsequent causes action.

[113] Bioventus OB at 13-14; Compl. ¶ 98.

[114] *See* Pl.'s Answering Br. in Opp. to Def. Bioventus' Mot. to Dismiss (the "PL Bioventus AB") 17-19, Dkt. No. 47; *see also Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citations omitted) ("Issues not briefed are deemed waived").

[115] Defs.' Ex. 12 & 13 at 11.

21

Bioventus's participation was knowing.[116] This would require Plaintiff to make a plausible allegation of scienter by pleading "specific facts from which [the] court could reasonably infer"[117] that the aider-and-abettor had "actual or constructive knowledge" of its participation in the breach.[118] One way this can be shown is by demonstrating that an acquirer created or knowingly exploited the target board's fiduciary duty breach.[119]

Stripping away those allegations that are entirely conclusory, Plaintiff does not allege specific facts sufficient to support an inference of that Bioventus engaged in anything but arms-length negotiations. Plaintiff's strongest assertion is that Bioventus actively bargained for an indemnification provision in the merger agreement, including clauses specifically identifying lawsuits already being brought by Kerbs and Plaintiff Teuza.[120] Per Plaintiff, this inclusion "leaves little doubt that Bioventus was acutely aware" of the Mann entities' fiduciary duty breaches.[121] However, knowledge of an allegation of a breach is not the same as knowledge of

---

[116] Plaintiff does not make any specific allegations that Bioventus aided and abetted the Director Defendants' breaches of their fiduciary duties. *See* Compl. ¶¶ 161-67. As a result, I limit my analysis to Plaintiff's central claim: that Bioventus was a knowing participant in the Mann entities' alleged conspiracy.

[117] *Jacobs v. Meghji*, 2020 WL 5951410, at *8 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

[118] *Id.* at *7 (quoting *Schorsch*, 2018 WL 1640169, at *5).

[119] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del. Ch. 2011).

[120] PL Bioventus AB at 14-15.

[121] *Id.* at 14.

the breach itself. Though Bioventus knew that litigation was pending, this fact alone is insufficient to imply that it knew Kerbs' claims had merit. Indeed, the contemporary state of the litigation implied otherwise. The record at the time disclosed that the Court had denied Kerbs' motion for a temporary restraining order in the referenced action.[122] As a result, Plaintiff has not pled specific facts from which I can reasonably infer that Bioventus knew of the Mann entities' breaches and actively supported or participated in them.

### 8. Count IX: Unjust Enrichment (Against Bioventus)

As discussed earlier, a claim for unjust enrichment requires the plaintiff to show "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[123] Accepting for the purposes of this analysis Plaintiff's contentions that the first three elements are satisfied by Bioventus's acquisition of the Company at an alleged discount,[124] Plaintiff fails to show an absence of justification. A low acquisition price alone is not proof of unjust enrichment absent some additional wrongful conduct.[125] Here, Plaintiff points to the same alleged conspiracy underlying its unsuccessful aiding and abetting claim.[126]

---

[122] *Kerbs v. Lindon*, C.A. No. 2021-0100-SG, Tr. of Telephonic Oral Arg. and Rulings on Pls.' Mot. for a TRO at 40:19-45:20, Dkt. No 107.

[123] *Garfield*, 277 A.3d 341 (citation omitted).

[124] PL Bioventus AB at 16-17.

[125] *In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *56 n.27 (Del. Ch. Mar. 1, 2021).

[126] PL Bioventus AB at 16-17.

Having failed to establish a non-conclusory basis for Bioventus's participation in this conspiracy, Plaintiff's unjust enrichment claim fails as well.[127]

### 9. Count II: Breach of Fiduciary Duty (Against Scott, Terrafranca, and Ruble)

In Count II, Plaintiff alleges that Defendants David Scott, Nicholas Terrafranca, and Joseph Ruble, all Company directors, breached their duty of loyalty to the Company in connection with the sale to Bioventus.[128] In its answering brief, Plaintiff admits *via footnote* that David Scott did not participate in the votes at issue.[129] Accordingly, Scott's motion to dismiss is GRANTED. The following analysis is limited to Defendants Terrafranca and Ruble (the "Director Defendants").

My finding that entire fairness review applies to the transaction in question "does not automatically doom the [Director Defendants'] motion to dismiss."[130] However, under *In re Cornerstone*, where the company's charter contains an exculpation provision, a plaintiff can overcome a director defendant's motion to dismiss by pleading bad faith, self-interest, or advancement of the self-interest of a

---

[127] While aiding and abetting's scienter requirement imposes a higher standard than is applicable for an unjust enrichment claim, Plaintiff's allegations fall short even under these more relaxed requirements.

[128] Compl. ¶¶ 132-35.

[129] PL Combined AB at 33 n.12. The Plaintiff should have withdrawn its breach of duty claim, instead of acting by footnote. It was coy when it should have been forthright.

[130] *Manti Holdings, LLC v. Carlyle Grp. Inc.*, 2022 WL 1815759, at *10 (Del. Ch. June 3, 2022).

party from whom the director defendant could not be presumed to act independently.[131]

Plaintiff argues that the Director Defendants were interested in the challenged transaction because they awarded themselves a $75,000 bonus for their "service."[132] However, Plaintiff admits that the Board voted on and awarded itself this self-dealing bonus *after* the merger was approved.[133] The Complaint is devoid of any non-conclusory allegations that the Director Defendants approved the merger because they knew there would be a subsequent payout.[134] Nor has Plaintiff established that this sum was material to the directors in question.[135] As a result, Plaintiff has not pled facts from which I can reasonably infer that the future possibility of bonus payments caused the Director Defendants to be interested in the merger.[136]

Plaintiff's next argument is that the Director Defendants engaged in self-dealing by approving the merger, which conditioned payout on a broad release of claims against both the Mann entities and the Director Defendants themselves.[137]

---

[131] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015).
[132] Compl. ¶ 100.
[133] *Id.*
[134] *See Id.* ¶ 101 (arguing that the Court should make an inference).
[135] Plaintiff merely makes the conclusory statement that it "would be material to essentially anyone." PL Combined AB at 40-41.
[136] Clearly, the bonuses were a self-dealing transaction. However, any fiduciary duty claim for this self-dealing bonus would inhere in Bioventus because the alleged breach occurred after the merger was approved.
[137] PL Combined AB at 34.

However, Plaintiff fails to allege specific facts from which I can reasonably infer that a viable claim against the Director Defendants was released (implying self-interest) or that the Director Defendants were not independent of the Company's controller. Accordingly, the Director Defendants' motion to dismiss is GRANTED.

### 10. Count III: Breach of Fiduciary Duty (Against Lindon)

Plaintiff next brings a cause of action for breach of fiduciary duty against Defendant Mark Lindon. Plaintiff alleges that Lindon, due to his longstanding relationship as an attorney for the Trust, was not independent from that entity in his capacity as a Company director and worked to advance the Trust's interests over those of the minority stockholders.[138] Plaintiff further contends that Lindon was so instrumental in negotiating and structuring the tainted transaction that he should be held liable despite resigning before it was consummated.[139]

I find Plaintiff's allegations sufficient to support a pleadings stage finding that Lindon was not independent of the Trust and worked to advance its interests in negotiating the challenged transaction while a Company fiduciary. Accordingly, Defendant Mark Lindon's Motion to Dismiss is DENIED.

---

[138] Pl.'s Answering Br. in Opp. to Def. Lindon's Mot. to Dismiss (the "PL Lindon AB") 15-18, Dkt. No. 48.

[139] PL Lindon AB at 8-11.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss under Rules 12(b)(2) and 12(b)(6) are GRANTED in part and DENIED in part. The parties are instructed to submit a form of order consistent with this decision.